**Robert CLAYTON, Plaintiff,**

v.

**TRUSTEES OF PRINCETON UNIVERSITY, a corporation of the State of New Jersey, Defendant.**

**Civ. A. No. 80–1611.**

United States District Court,
D. New Jersey.

May 6, 1985.

414

Neil Mullin, Morton Stavis, Hoboken, N.J., for plaintiff.

William J. Brennan, III, Alexander P. Waugh, Jr., Smith, Stratton, Wise & Heher, Princeton, N.J., for defendant.

## OPINION

HAROLD A. ACKERMAN, District Judge.

This case presents the difficult and delicate issue of what role a court of law should play in reviewing a university's student disciplinary proceeding. In this case, Robert Clayton, a very intelligent and able student, was suspended for a year from Princeton University following a determination by the student Honor Committee

that he had cheated on March 6, 1979 while taking a biology lab practical. This decision was affirmed by the President of Princeton University, William G. Bowen. Although Mr. Clayton later returned to Princeton and successfully completed his studies, the vigor with which this suit was litigated many years after the incident demonstrates the intensely felt sympathies and concerns on each side of this issue.

Gene Smith in his biography of Woodrow Wilson, who was head of Princeton University early in this century, describes Wilson's reaction to the same issue over 80 years ago. A student was expelled for cheating and:

> his mother came to plead for his reinstatement with the man who passed upon the expulsion. She said she was undergoing serious medical treatments and that the shock of having her boy expelled might well bring those treatments to naught. The answer was, 'Madam, you force me to say a hard thing, but if I had to choose between your life or my life or anybody's life and the good of this college, I should choose the good of the college.' But he could eat nothing at luncheon that day.

*See* G. Smith, **When the Cheering Stopped—The Last Years of Woodrow Wilson**, 28 (1964, William Morrow and Co.).

My conclusion in this case is that Princeton has accorded Mr. Clayton fundamental fairness in convicting him of cheating, and that is all that the law requires. While this ruling may resolve the case at hand, I am under no illusions that it will put to rest the heated debate engendered by this and other incidents where long established honor systems have been attacked. Public opinion on the subject naturally runs the entire gamut from the cynical to the reverential.

Joseph J. Ellis, former West Point instructor and author of **School for Soldiers**, commented:

> We don't live in a world in which there exists a single definition of honor any more, and it's a fool that hangs on to the traditional standards and hopes that the world will come around to him.

*See*, "Cheating Promps Air Force to Halt Cadet Honor Boards", **NEW YORK TIMES**, Sept. 20, 1984, p. 1, col. 3.

On the other hand, William Fishback, a University of Virginia spokesman, was quoted in the same article as saying of the University of Virginia's Honor Code:

> It is the one precious thing to the alumni. Wherever you travel around the country the alumni will ask after the condition of the honor system. *Id.*

While there is no particular evidence before me on the attitudes of the Princeton alumni to their Code, I surmise that their concern is also great. I surmise also that some of their respect for the Code is a retrospective appreciation of the role the Code has played at Princeton in turning young students into adults who must take personal responsibility for their own actions.

Oscar Wilde in an epigram once described a cynic as being a person who knows the price of everything and the value of nothing. If my premise regarding alumni concerns is correct, I suppose one could look cynically at such idealism. Being "burdened" with an honor system, however, can reasonably be viewed, as a vote of confidence in the maturity of a young adult.

While there are certainly some doubters, some cynics, and even some cheaters at Princeton, there is evidence in this case that some Princeton students do, even prospectively, recognize the value of the Code. Princeton has concluded that an honor system can have a beneficial effect on the training and education of its students, and I do not view that choice as being devoid of value.

With that backdrop in mind, I turn to the facts of this individual case.

### FINDINGS OF FACT

The following findings of fact are made pursuant to Rule 52 of the Federal rules of Civil Procedure.

The plaintiff, Robert Clayton as admitted to Princeton University as a member of the Class of 1981. On Saturday, March 10th, 1979, (four days after the episode) Clayton,

then a sophomore, was convicted by a student-run disciplinary body, the Honor Committee, of cheating during a biology laboratory exercise.[1] Mr. Clayton was suspended for one year, a result of which he did not graduate until June of 1982. He did, however, successfully graduate and go on to medical school.

The defendant, The Trustees of Princeton University, is an educational corporation in the State of New Jersey. It operates the well known and prestigious institution of higher education known as Princeton University ("Princeton"). Princeton offers undergraduate programs leading to the degrees of Bachelor of Arts and Bachelor of Science in Engineering. It has approximately 4,450 students in its undergraduate division and approximately 1,445 students in its graduate division.

The plaintiff has raised numerous areas where he feels his rights under the Princeton Honor Code were denied. They are as follows:

He was not properly advised of his rights under the Honor Constitution; the Honor Committee abrogated his right to have an advocate on his behalf at the hearing; they improperly interrogated him prior to the hearing; they abrogated his right to call witnesses on his behalf at the hearing; the Committee was biased; the Committee failed to keep proper records of its proceedings; they misrepresented the record to President Bowen; and Princeton failed to supervise or otherwise control the Committee. Each of these issues will be discussed seriatum.

### THE HONOR SYSTEM

With respect to its undergraduate students, Princeton maintains a bifurcated disciplinary system with non-concurrent jurisdiction in two committees, the Princeton Honor Committee and the Faculty-Student Committee on Discipline. Charges of violations of rules and regulations with respect to academic exercises not covered by the Honor System, including essays and laboratory reports, are adjudicated by the Faculty-Student Committee on Discipline. The Faculty-Student Committee has administrative, faculty and student members and can impose penalties ranging from censure to expulsion.

The Faculty-Student Committee has no jurisdiction over matters relating to cheating during written examinations, even if the faculty member administering the examination fails to adhere to the formalities which attend the administration of written examinations. It is the nature of the exercise, not the presence or absence of certain formalities, which determines the jurisdiction or the Honor Committee. A form of the phrase, "at Princeton, all written examinations are conducted under the Honor System," appears in virtually every University publication before the Court. Plaintiff originally contended that the Honor Committee did not properly have jurisdiction of this matter, but plaintiff no longer urges the court to reach this issue, and I shall not.

In 1893, the undergraduate students at Princeton established the Honor System. Prior to that year, all undergraduate examinations were proctored by University personnel, and charges of cheating were adjudicated by the faculty and administration. Since then, all written examinations are under the Honor System. Charges of violations of the Honor System are adjudicated by the Honor Committee, an all student body, with a right of appeal to the Presi-

---

**1.** As I explained in my opinion on the parties' earlier motions for summary judgment, *see Clayton v. The Trustees of Princeton University,* 519 F.Supp. 802 (D.N.J.1981) (*Clayton I*), the question on the lab practical which gave rise to this entire incident concerned the identification of a notochord on the creature called the amphioxus. As I stated:

> Evolutionists sometimes give the amphioxus credit for being the first creatures to possess a notochord, a feature that they believe eventually led to the evolution of the human spinal column. Whether the evolutionists are right or wrong, it is clear that the case before me today evolved from one poor amphioxus that had been cut up so that its notochord could be displayed to a group of Princeton University undergraduates.

dent of the University. The system is still viable.

Cheating allegations are adjudicated by the Honor Committee, composed of seven present and past presidents of Princeton's undergraduate classes. At the time of Robert Clayton's conviction, the Honor Committee consisted of the presidents of the four undergraduate classes, two members of the senior class and one member of the junior class. The Chairman of the Committee was the senior who had been president of his junior class.

The members of the Honor Committee are agents of Princeton for purposes of fulfilling their Honor Committee responsibilities. The Constitution of the Honor System states:

Violations of the Honor System shall consist of any attempt to receive assistance from written or printed aids, or from any person or papers, or of any attempt to give assistance, whether the one so doing has completed his or her own paper or not. This rule holds both within and without the examination room during the entire time in which the examination is in progress, that is, until all papers have been handed in. Article V, par. 1.

The Honor Constitution and any informational materials explicitly state that it is an Honor Code violation both to give or to receive assistance on an examination. *See e.g.*, Honor System materials in Matriculation packet; Admission Information bulletin; Undergraduate Announcement; Rights, Rules and Responsibilities. Indeed, after every examination a Princeton student must write and sign a pledge on the exam paper stating, "I pledge my honor that, during this examination, I have neither given nor received assistance." *Honor Constitution*, Art. V, Par. 4.

There was some confusion in the testimony at trial, however, as to whether failure to report an incidence of cheating was a violation of the Honor Code. A careful review of the testimony and the Princeton publications discussing the Honor Code leads me to conclude that failure to report an observed incidence of cheating is not an Honor Code violation. At most, failure to report a violation of the Code is a violation of tradition and common understanding. *See* Plaintiff's Exhibit 5, April 1977, letter from Robert A. Connor, Chairman of the Honor Committee to newly accepted undergraduates; Plaintiff's Exhibit 7 "The Undergraduate Announcement", April 1976 at p. 23; Plaintiff's Exhibit 8 "Rights, Rules, Responsibilities, Guidelines for Students," 1978 ed. at p. 31.

The honor pledge is to be given on each written examination. Refusal to sign the honor pledge on any examination paper is "prima facie evidence of violation of the Honor System." (Article V, Paragraph 3, Honor Constitution). It "must at all times be written and signed by the student." (Article V, Section 4).

Central to the Honor System is Princeton's Honor Constitution. It details the rights of the accused, the manner in which they shall be investigated, tried and penalized, defines violations of the Honor System, and empowers the Honor Committee to adjudicate alleged violations. In addition, Princeton's annual publication "Rights, Rules, Responsibilities—Guidelines for Students," states that "[m]uch of the internal organization and virtually all of the operating procedures of the Honor Committee are determined by the Committee itself. The tone and style of each year's Committee may vary, but there is a remarkable continuity in procedure from year to year." *Id.*, page 32.

Upon receipt of a charge of a violation of the Honor System, the Committee is empowered to conduct an investigation and, if the facts warrant it, a hearing, to determine whether the accused student is guilty or not guilty. The accused has a right to receive an unsigned letter written in some reasonable detail by the accuser, delivered at least 24 hours prior to the hearing by the chairperson of the Committee. (Article IV, Section 5). If convicted, the student may be suspended for one year or permanently separated from the University. (Article III, Section 2). The student has a right of appeal to the President. (*Ibid*).

At the time of Clayton's appeal, there was no record of an Honor Committee's ruling having been overturned by the President of the University.

Article IV of the Honor Constitution sets forth in detail various rights of the accused student and the procedures to be followed in conducting hearings. Prior to the hearing, the accused shall have his rights explained to him and shall be asked to sign a statement that the rights have been explained. Article IV of the Honor Constitution states in pertinent part:

3. Six of the seven votes shall be necessary for conviction. If fewer than seven members shall hear a case, unanimity shall be necessary for conviction. A quorum shall consist of five members.

\* \* \* \* \* \*

5. The accused shall learn of the charges brought against him or her through an unsigned letter written in some reasonable detail by the accuser and delivered at least twenty-four hours prior to the hearing by the Chairperson of the Committee who shall explain the charges and enumerate the rights of the accused as hereinafter provided in Article IV, Section 6. The accused shall be asked to sign a statement prior to a hearing saying he or she has been informed of his or her rights under the Honor Constitution.

6. The rights of the accused shall include:

a. the right to review in advance all documents constitutioning direct material evidence;

b. the right to call witnesses;

c. the right to have at any hearing an adviser of his or her choice from among the resident members of the university community, who may speak on his or her behalf and cross-examine the witnesses;

d. the right, in the event of a conviction, to receive a copy of a summary statement of the grounds for the Committee's decision, and to poll the votes of the individual Committee members;

e. the right in the event of conviction to receive a record of the hearing.

The role of the adviser provided for in section 6(a) of Article IV has been referred to in this litigation as that of the "defense adviser," and plaintiffs have critiqued the defense adviser's actions in terms of what would have been effective and zealous representation of an accused by defense counsel in a court proceeding. No evidence was presented, however, to indicate in any way that the role of defense adviser as envisioned by the framers of the Princeton Honor Constitution and carried out in the regular course of Honor Committee proceedings is the same as the role an attorney-at-law should play in an adversary proceeding before a court of law.

I ruled in my opinion on summary judgment that the instructions given by the Honor committee to Clayton's defense advisers that the advisers were to provide a 'balanced' picture rather than be 'overly partisan' may have compromised Clayton's defense. This conclusion was, however, made as a result of drawing every inference in favor of plaintiff Clayton, as is proper on a summary judgment motion. The testimony and evidence I have reviewed after a plenary trial now leads me to conclude that there was no error in either the guidance the defense advisers were given concerning their duty or the actual way in which they carried out their duty.

While the adviser clearly should act only in the interests of the accused, the manner the adviser may deem most effective is determined by the unique nature of the Honor Committee hearing which is not completely an adversarial hearing. A careful review of the testimony convinces me that Princeton, in its Honor Constitution, and in its implementation thereof, has sought to permeate the proceedings with fairness and truth at the expense of a zealous defense.

Article VI of the Honor Constitution requires the Committee to keep a written record of all cases acted upon, and these records, along with the Constitution are

"for the instruction of the Committee." Plaintiff alleges that his rights were denied under this Article because the Committee failed to maintain proper records both before and during the hearing. Prior to Clayton's hearing, the Committee had lost the written records of all prior Honor Committee hearings and decisions.

■ While the loss of these records was unfortunate, I do not find this violation of Princeton's established procedures to be the substantial and material violation plaintiff makes it out to be. The Honor Committee which convicted Clayton did keep its own records, and in convicting Clayton they relied on their "own best judgment" and "that precedent of which [they were] aware." (*See* Committee's Letter to President Bowen.)

In addition, I have found no evidence indicating that the absence of these records adversely impacted Clayton's case in any way.

Article VI also provides that "the Committee may use recording devices to tape the proceedings of each case." Plaintiff correctly points out that the actual tapes of the hearing are of a poor quality, and that parts of the hearing testimony were never recorded, including the Committee's visit to the laboratory where the alleged cheating incident had taken place.

■ While it would certainly have been better for the Committee to have kept a more complete record of the Clayton hearing, Princeton's own regulations did not require them to meet such a high standard. There is simply no requirement in the Constitution or elsewhere that a verbatim record of the hearing be kept. Plaintiff attempts to graft the requirements of a judicial, adversarial hearing onto a college disciplinary hearing, and I do not find such standards to be appropriate.

■ Plaintiff also alleges that he was not adequately advised of his rights under the Honor Constitution. I find that Clayton had actual and constructive knowledge of Princeton's Honor System at the time of his arrival at Princeton as a Freshman, and in March of 1979, prior to his first contact by the Honor Committee concerning this case.

Prior to becoming a student at Princeton, each accepted applicant must complete various matriculation forms, including a written statement agreeing "to uphold the primary principles of the Honor System." That statement is written on the blank portion of a printed form which contains an explanation of the Honor System and the complete text of the Honor Constitution. Clayton received these matriculation forms and wrote an essay in his matriculation papers, stating that he understood the Honor Code.

The 1976—1977 version of the Princeton University publication entitled *An Introduction to Princeton, Admission Information,* contained a brief description of the Honor System. The *Undergraduate Announcement* for 1976—1977 and 1978—1979 contained information on the Honor System. In addition, *Rights, Rules, Responsibilities,* 1978 edition, described the Honor System and its current procedures and reprinted the full text of the Honor Constitution. Prior to March of 1979, Clayton had received copies of these publications.

Incoming undergraduate students are required to attend a meeting concerning the Honor Committee during the orientation period. The purpose of that meeting is to acquaint the new students thoroughly with the Honor System. Such a meeting was held in September of 1977, when Clayton was an entering freshman at Princeton. He did not recall whether or not he attended such a meeting. The Honor Constitution is also regularly published in the student newspaper, the *Daily Princetonian.*

It is, therefore, inconceivable to me that Clayton could assert that he was unaware of his rights under the Honor Constitution.

## THE LAB PRACTICAL

In March of 1979, Clayton was a sophomore at Princeton and a member of its

swim team. He was also a student in a course entitled Biology 204.

On March 6, 1979, Clayton took a make-up written examination or quiz, referred to as a "lab practical", because he had been at a swim team event when the examination was originally given. Two other students were taking the make-up examination at that time: Howard Nelson ("Nelson"), a fellow member of the swim team, and Robert Varrin ("Varrin"), who had missed the original examination to attend a track meet.

The examination consisted of the identification of a number of laboratory specimens, slides, and model parts, which requires the students to walk around the laboratory room.

Eleanor Maine ("Maine"), a Teaching Assistant employed by Princeton, remained in the laboratory while the students were completing the examination because students frequently have questions about biology lab practical examinations, such as the exact location of the organ to be identified. Both Clayton and Nelson asked questions of Maine during the time they took the test. Maine sat in the room doing some reading during the exam. It was not her intent to proctor the examination. During the course of the examination, Maine left the room at least once, and, in fact, was not in the room during the events which led to the accusation against Clayton.

Maine did not request the students to write out the honor pledge because she was under the impression that it was not necessary for her to do so. Under normal University procedures, however, Ms. Maine should have asked that the pledge be signed, as she considered the examination to be under the Honor System. Whether the exam technically was administered under the Honor Code is irrelevant to this proceeding as plaintiff has waived his original allegations concerning improper jurisdiction of the Honor Committee.

After Clayton and Nelson had finished the examination and had handed in their papers, Nelson asked Maine when and where he and Clayton could take another make-up examination in the same course. Maine left the room to inquire about the second make-up examination, while Clayton and Nelson remained. Varrin was still working on his examination, having started a few minutes later than the others.

For the period during which Maine was out of the room, the versions of the event vary. According to Varrin, Clayton spoke with Nelson, consulted a lab manual, retrieved his examination paper from Maine's desk and changed his answer to question 19. According to Clayton, Clayton spoke with Nelson, attempted to consult a lab manual, looked at his examination paper and confirmed the correctness of his answer to question 19, but did not change his answer thereto. Having ascertained the location of their next examination, Maine returned and told Clayton and Nelson about the other make-up examination, whereupon they left.

In this proceeding, the court is not concerned with which version is true. My job is not to second guess the substantive decision of the Honor Committee. The Honor Committee obviously believed Varrin's version of the facts, regardless of the contradictions found in his testimony.

## THE HONOR COMMITTEE INVESTIGATION

Varrin attempted to locate a member of the Honor Committee to whom he could report the cheating incident. After speaking to a member of the Faculty-Student Committee on Discipline, Varrin eventually was put into contact with Craig Marx ("Marx"), who was then Chairman of the Honor Committee.

Varrin met Marx in Firestone Library on Thursday, March 8, 1979, at which time they discussed the incident. Marx requested Varrin to prepare a written letter of accusation as soon as possible. Varrin prepared the letter and gave it to Marx later that evening. I find any inference suggested by plaintiff that the letter was not the sole product of Mr. Varrin completely unsupported by the evidence.

Because Varrin did not know either of the other two students who took the examination with him, it was necessary for him to attempt to identify them. On Thursday night, after he had given Marx the letter of accusation, Varrin met with Marx and another member of the Honor Committee, Christopher Shields ("Shields"). Marx had requested Shields, an experienced Committee member, to assist him in investigating Varrin's accusation. The students first went to Tiger Inn, of which Varrin thought Clayton might be a member. After Varrin was unable to identify Clayton from pictures of Tiger Inn members, the students went to Cottage Club, where they met Brian MacDonald ("MacDonald"), an Honor Committee member who was also a member of the Princeton swim team. Varrin eventually identified Clayton from a photograph in a swim team publication produced by MacDonald. The identification process took approximately one and a half to two hours.

Following the identification of Clayton by Varrin, MacDonald told Marx and Shields that he did not intend to participate in the Honor Committee's investigation or hearing because both he and Clayton were members of the swim team. At that time and the next day, Shields attempted to persuade MacDonald to participate in the Clayton hearing. Shields suggested to MacDonald that his participation would enhance the prospect that nothing in Clayton's favor would be missed, especially because of his knowledge of Clayton from the swim team. Marx, however, concurred in MacDonald's decision not to participate.

On the evening of Thursday, March 8, 1979, Marx telephoned Clayton and told him that he had been accused of violating the Honor Constitution. Marx wanted to know if some members of the Honor Committee could come over and talk to him about it. Clayton responded by saying that he "wished they would come over and get it cleared up right away." (Clayton testimony, Vol. 2, p. 24, line 23). Marx and Shields went to Clayton's room at approximately 10:00 or 10:30 p.m. and discussed the cheating allegation with him for about forty-five minutes.

During this meeting, Marx and Shields read the letter of accusation to Clayton at least twice in full. Clayton was permitted to look at the letter while Marx or Shields held a hand over the accuser's name, but he was not given a copy of the letter. Marx and Shields explained that they were not allowed to show Clayton the accuser's name, and they hadn't had a chance to xerox the letter without the name on it. Having read the letter several times, Clayton was at this point substantially acquainted with the substance of the charge against him. It is clear to me that he knew precisely what he had been accused of.

The credible testimony showed that Clayton was asked for his version of the events surrounding the alleged cheating incident. Clayton flatly denied having cheated, and Marx and Shields continued to ask him specific questions about the sequence of events contained in the letter of accusation. There was some testimony that he changed his story somewhat during the interview, but essentially he denied the accusation that evening and thereafter.

During this discussion, Marx and Shields informed Clayton generally of some of the rights he had under the Honor Constitution. Clayton's right to have a defense adviser and to have a copy of the letter of accusation were explained to him very explicitly. It was mentioned that other rights were detailed in the Honor Constitution, printed in *Rights, Rules, Responsibilities*. While each of Clayton's rights were not spelled out in *Miranda* [2]-like fashion, I find he was reasonably apprised of his rights and given a chance to investigate them further, had he so desired. Clayton may not have understood all his rights in detail at that time because, as he stated, "it was a very shocking experience and unnerving, and it was all very confusing, to say the least" (Clayton testimony, vol. 2, p. 28–29, lines 24 through 1) But he was

**2.** *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

afforded a reasonable opportunity to learn about those rights, through both his conversation with Marx and Shields and his receipt of numerous Princeton publications concerning the Honor Code discussed earlier.

In the course of the questioning, Marx or Shields asked Clayton who the other person was that Varrin had accused. Clayton informed them that Howard Nelson had been with him during the lab practical. Marx and Shields informed Clayton before leaving him that they were going over to meet with Nelson, then discuss the accusations with the accuser again before making a decision whether to hold a hearing or not.

Before leaving him, Marx told Clayton not to speak to Howard Nelson. After Marx and Shields had left, Clayton unsuccessfully attempted to reach Nelson by telephone. Because the telephone was busy, Clayton went to Nelson's room, arriving before Marx and Shields, and spoke to Nelson. Clayton testified that he only told Nelson, in substance, "Howard, these people are going to come to talk to you. I have been accused of cheating. I want you to stay calm, collected, and tell the story exactly the way you know it." (Clayton transcript, vol. 2, p. 55, lines 10–13). He then returned to his room. Clayton's conversation with Nelson was contrary to the specific request made by them. Such actions could give rise to an inference that they arranged their stories, but there is in fact no evidence that this happened.

After Clayton left Nelson's room, Marx and Shields arrived and discussed the accusation with Nelson. After speaking with Clayton and Nelson, Marx found and spoke briefly with Varrin. Having verified that Varrin was certain of his accusation, Marx decided to hold a hearing concerning Clayton and Nelson before the entire Honor Committee.

At approximately 1:00 a.m. on March 9, 1979, Clayton and Nelson were informed that a hearing would be held. At some point, the hearing was scheduled for Saturday, March 10, 1979, beginning at 9:00 a.m.

At that time, Shields gave Clayton and Nelson the names of several students who were willing to serve as defense advisors. Although the list did not include faculty members, Clayton had been told that he could have any resident member of the University community as a defense adviser, which is expressly stated in the Honor Constitution. Clayton admitted that he understood that he was not restricted to the people whose names were given to him by Shields.

The students on the list were former members of the Honor Committee, students who had previously served as defense advisers, or students who had expressed an interest in doing so. Shields did not recommend any particular student on the list over any other.

■ Clayton raises the failure of the Committee to inform him that he could ask a faculty member to be his adviser as an example of how his right to have an advocate on his behalf at the hearing was abrogated. Neither the Honor Constitution nor any other materials describing the Honor System place an affirmative duty on the Honor Committee to notify the accused that faculty members may also serve as defense advisers. Mr. Clayton should have been aware of the general language of the Honor Constitution allowing him to choose from "among the resident members of the University community," or he could have inquired directly about a faculty adviser, but he chose not to. The fact that Clayton conferred with Professor Mahoney concerning his strategy at the hearing indicates that Clayton was not completely unaware that he could turn to a faculty member for assistance in this matter (*see infra*).

Between 1:00 a.m. and 2:00 a.m. on March 9th, Clayton and Nelson contacted and met with Derek Kirkland ("Kirkland"), whose name had been among those supplied by Shields. The meeting lasted at least one hour, during which time Kirkland, Clayton and Nelson discussed the accusation in some detail. Although a copy of the letter of accusation was not available at the meeting, Clayton knew of its contents.

There was also a brief discussion of the Honor Committee procedures. At the time, both Clayton and Nelson were aware that Kirkland had never before acted as a defense adviser. Kirkland left Clayton's room to meet with Shields, having not yet decided whether he could act well as a defense adviser.

During their almost four years at Princeton, Kirkland and Shields saw each other occasionally and considered each other friends. They did not socialize together. They had been in the same dormitory during their freshman year (1975–1976). Shields appointed Kirkland to be chairman of a student committee during the 1976–1977 academic year.

Through their acquaintance, Kirkland and Shields came to discuss the Honor Committee on several occasions. At Shields' suggestion, Kirkland expressed a willingness to serve as a defense adviser. Shields put him on the list of potential advisers. By the time he was contacted by Clayton, Kirkland had familiarized himself with the Honor Constitution and discussed it with Shields. Clayton was aware that Kirkland knew Shields.

Kirkland arrived at Shields' room between approximately 1:30 and 3:00 a.m. For the next hour or hour and a half, they discussed the Clayton case, and the role of the defense adviser in some detail. The letter of accusation and a copy of *Rights, Rules, Responsibilities* were used during the meeting. Based upon his discussion with Shields, Kirkland decided that he could "do a good job" as Clayton's defense advisor.

In spite of his friendship with Shields, I find that Kirkland in no way compromised his integrity in effectively representing Clayton. The defense he presented before the Committee is the best evidence that his friendship with Shields did not prevent him from actively seeking to protect Clayton's interests during the hearing.

During the course of their conversation, Shields let Kirkland read the letter of accusation. When Kirkland read the letter, he found that its substance was the same as the substance of the charge conveyed to him by Clayton earlier that night. As Kirkland put it during the trial, the letter "contained ... no surprises."

During their conversation, Shields described his reactions to Clayton and Varrin, as well as observations about the strengths and weaknesses of their respective versions of the events.

Kirkland recalled Shields saying something to the effect that "it looks bad for Bob." Although Shields did not recall using these exact words, he testified that he might well have said something to that effect, in order to underscore to Kirkland the seriousness of the situation. At trial, Kirkland characterized Shields' observations as an effort by Shields to be helpful by alerting him to problems which he might have in acting as Clayton's defense adviser. Kirkland was "grateful" to Shields for giving him the information. In connection with Clayton's subsequent appeal to President Bowen, Kirkland described Shields' efforts as intended "to help [him] help the accused", motivated, in part, because he was "concerned about the position of the accused."

At the time, Kirkland was concerned that Shields might have a bias which was not favorable to Clayton. However, he believed that Shields would "try quite hard to keep an open mind". Shields felt that he had no bias, but corroborated Kirkland's testimony that the remarks were intended to help Kirkland do the best job possible for Clayton.

A substantial portion of the conversation between Shields and Kirkland concerned the role of the defense adviser, which has been the subject of considerable testimony in this case. This type of meeting was the time during which a member of the Honor Committee was to explain the role of the defense adviser to the person chosen by the accused student. Shields and Kirkland had discussed the role of the defense adviser in general terms over the preceding year.

At trial, Kirkland testified that he perceived the role of the defense adviser as "a

shade ambiguous", acting partially for the accused and partially for the Committee. He understood that it was his duty to be present when the accused was not, "in order to insure that all the facts relevant to the accused's position be known." He was to "present questions such that the answers might be favorable to [Clayton and Nelson]." On the other hand, Kirkland understood it to be his obligation to bring unfavorable facts to the attention of the Committee, a view not necessarily shared by Shields and other members of the Honor Committee who testified at the trial.

Kirkland understood that he was "to act as [a] not completely neutral, but on the other hand, not completely partisan advocate." Although Kirkland saw "potential conflicts" in this, as he saw it, ambiguous role, he testified that "they were not in direct conflict in this situation." From prior conversations with Shields, Kirkland understood that the Committee was concerned about being misled by defense advisers who were overly partisan.

Other than the question of making unfavorable facts known to the Committee, Shields' description of his conversation with Kirkland on the advocate's role is entirely consistent with Kirkland's. In this regard, it is noted that there has been no allegation in the Complaint or Pretrial Order that Kirkland brought facts unfavorable to Clayton to the attention of the Committee.

The role of the defense adviser described by Shields and Kirkland is consistent with the understanding both President Bowen and Donna Packard had of the defense adviser's role, both of whom had extensive experience with the Honor Committee prior to the Clayton hearing.

Shields and Kirkland also discussed possible motivations for Varin's decision to bring an accusation against Clayton. This topic was also discussed at a subsequent meeting, which included Hamel. This issue was discussed as part of Shields' efforts to help Kirkland in his role as Clayton's defense adviser. Kirkland concluded that "there was no maliciousness of intent" on Varrin's part. There appeared to be "no relationship at all" between Varrin and Clayton or Nelson. He determined that Varrin had not brought a prior accusation, that he was an athlete and, therefore, not likely to be prejudiced against athletes and that he was not a pre-med student, as Clayton was.

The final topic discussed by Shields and Kirkland at their late night meeting was the need for an additional defense adviser. Kirkland felt that, because there were two accuseds and because he wanted someone with some experience to assist in the defense, it would be a good idea to have a second defense adviser. According to Kirkland, Shields suggested Packard, who had not only acted as a defense adviser at least once, but who had been a member of the Honor Committee and the Faculty-Student Committee on Discipline. As will be seen, Kirkland was not able to contact Packard until later in the afternoon of Friday, March 9th.

On the morning of Friday, March 9, 1979, Kirkland, Clayton and Nelson met in the laboratory room where the examination had taken place. Clayton and Nelson reenacted their version of the events. In addition, they discussed the results of the meeting Kirkland had had with Shields, late the previous night. There may also have been a discussion of overall strategy in terms of Shields alleged bias and the perceived procedural irregularities. The meeting lasted approximately an hour.

Following the meeting in the laboratory room, Kirkland, Clayton and Nelson went to visit Professor Michael Mahoney, whom Kirkland described as "a trusted friend of Clayton's and Nelson's." At that time, there was a discussion of overall strategy, which centered on what the group perceived as a series of procedural violations committed on the previous evening. These included the failure to give Clayton the written charges and Shields' alleged bias. Professor Mahoney was attempting to think of a way to get the case away from the Honor Committee and prevent it from coming to a hearing. It was subsequently

decided that an attempt should be made to procure Shields', and possibly Marx's, recusal, so that the Committee would lack a quorum. These procedural discussions evidence an extensive knowledge of Honor Committee procedures and rights.

Following the meeting with Professor Mahoney, Kirkland, Clayton and Nelson went to Nelson's room and talked for a while.

Following the meeting in Nelson's room, Kirkland arranged his meeting with Shields and then met with Packard to discuss the case for the first time. Kirkland went over the case with Packard. It was decided to present a joint defense with Kirkland having primary responsibility for Clayton and Packard primary responsibility for Nelson, but that, "in large measure, the roles [would be] conjoint." They discussed the idea of removing Shields. During the discussion, there was uncertainty about whether Shields was really biased and whether the recusal was worth pursuing. Packard thought it was worth pursuing. A possible severance and other issues were discussed.

At approximately 5 p.m. on Friday, March 9th, Kirkland met with Shields and Warren Hamel ("Hamel"), a member of the Honor Committee.

Shields gave Kirkland a copy of the letter of accusation, with Varrin's name blocked out. When Kirkland expressed concern that the letter was not being received more than twenty-four hours before the hearing, Shields and Hamel offered Kirkland an adjournment of the hearing, possibly to the following day or the following weekend. Kirkland, who understood that the Committee would be flexible concerning the adjournment, agreed to relay the offer to Clayton and Nelson.

Plaintiff points to the lack of 24 hours notice in violation of Article IV, Section 5 of the Honor Constitution as yet another violation of his rights by Princeton. I find such a minor deviation from the regulations inconsequential. The Honor Committee showed Clayton the letter of accusation when they first approached him on the

evening of Thursday, March 8, and Clayton was reasonably apprised of the accusation at that time. In addition, Clayton was given an opportunity to adjourn the hearing to a later date should he have felt that the lack of notice disadvantaged him in any way.

One of Kirkland's purposes at this meeting was the attempt to have Shields recuse himself, perhaps with the result that the Committee would lack a quorum to try Clayton. At the same time, Kirkland did not want to antagonize Shields. For this reason, he broached the subject with caution. Apparently, he did so without directly asking Shields to disqualify himself, but in such a manner that neither Shields nor Hamel were actually aware of Kirkland's ultimate goal of disqualification. Shields only understood Kirkland to be asking if he had prejudged the case. As soon as it became apparent that Shields did not see himself as biased against Clayton, Kirkland dropped his effort.

■ I do not find the evidence to have demonstrated that Shields was unfairly biased against Clayton, and I find no impropriety in the fact that he did not recuse himself. When the prosecutorial and judicial functions of a deliberative body are combined, it is to be expected that a member of that body may comment on the strength of the evidence against an accused before the verdict is announced, but I do not think that necessarily precludes a fair and impartial factfinding process.

Christopher Shields was depicted by plaintiff as a biased, aggressive individual who thoroughly dominated the proceeding as an inquisitor. Plaintiff further alleged that Shields was determined to exploit Clayton's predicament to save the Honor System.

I found Mr. Shields to be an intelligent somewhat aggressive individual thoroughly devoted to the principles of the Honor System. While Derek Kirkland, as previously stated, felt Shields had a bias against Clayton, I am persuaded that this was not the case. Shields and his four colleagues on

the Honor Committee painstakingly sought to ascertain where the truth lay and acted accordingly. Shields was more voluble than any other member of the Committee during the hearing, but this is not uncharacteristic of a judicial or quasi-judicial proceeding.

On balance, I believe Shields sought to reach a just result.

Returning to Kirkland's meeting with Shields, there was a general discussion of the alleged procedural irregularities, during which Hamel informed Kirkland that he did not perceive a significant departure from the Committee's usual practices. There was also a discussion of witnesses, including those to be called by Kirkland. The role of the defense adviser was again discussed in some detail. Shields and Hamel told Kirkland that he was to "consider himself an eighth member, nonvoting, of the Committee", and that he was "to put forward the best case possible for the defendant, and bring to the Committee's attention all the facts that are relevant." Kirkland's obligations to the accused student and to the Committee were explained.

The meeting lasted approximately forty-five minutes.

After meeting with Shields and Hamel, Kirkland met with Packard, Clayton and Nelson to discuss the results of that meeting.

Clayton and Nelson decided to reject the adjournment offered by Shields and Hamel, because they were ready for the hearing. In Kirkland's words: "it did not seem as though there was any major purpose that could be served by it at that time." Kirkland also characterized the lack of twenty-four hours written notice as "a straw issue" and "not all that important at all." All four were ready to proceed on the following day. Although Clayton was particularly "keen" because he wanted the matter resolved before he took examinations the following week, Kirkland made it clear that, had it been important, they would have adjourned the hearing.

Packard then described the procedures which would be followed during the hearing, drawing upon her experience as a former member of the Committee and an experienced defense adviser. There was also a discussion of the type of demeanor which Clayton and Nelson should display before the Committee and a further discussion of the facts. This meeting lasted approximately one to one and a half hours.

Following the meeting among the two defense advisers and the two accused students, Kirkland and Packard met further to discuss the case and the coming hearing. During that meeting, Packard telephoned Assistant Dean Richard Williams, who was her thesis adviser and a fellow member of the Committee on Discipline. Packard called Dean Williams for his advice only, since she knew that he had no authority to interfere with an Honor Committee matter. They discussed the perceived procedural irregularities, particularly the allegation that Shields had developed a bias because of his initial contact with Clayton. Dean Williams advised Packard, having heard only her side of the story. This session lasted approximately one to one and a half hours.

Sometime during the evening of Friday, March 9th, Clayton reached Richard E. Forrestel ("Forrestel") a fellow swimmer, who had gone to Philadelphia. Clayton asked Forrestel to be a character witness at the hearing. Forrestel agreed to do so. Packard also spoke to Forrestel about his testimony for Clayton. Earlier in the day, Professor Mahoney had agreed to act as a character witness.

At sometime following the meeting among Kirkland, Packard, Clayton and Nelson, Kirkland telephoned Shields to refuse the adjournment and to give him the names of the defense witnesses—Forrestel, Professor Mahoney and Maine. Although, at trial, Kirkland did not recall that he had asked that Maine be called, it is clear from the hearing record that the Committee had not intended to call Maine, but that Kirkland requested that it do so.

Sometime on Friday, March 9th, Kirkland raised the question of jurisdiction with Shields, who told him that the Honor Committee had jurisdiction. Nelson raised the same question with Dean Williams, who gave a similar response. At trial, Packard, a former member of both the Honor Committee and the Discipline Committee, testified that there was "no question" that the case belonged before the Honor Committee.

## THE HONOR COMMITTEE HEARING

The Honor Committee hearing began at approximately 9:00 a.m. on Saturday, March 10, 1979. The Committee members who heard the case were Marx, Shields, Hamel, Karen Jones and James Bailinson ("Bailinson"). MacDonald had decided to disqualify himself and Robert Thomas ("Thomas") was not available that day. The witnesses were Varrin, Professor Mahoney, Maine, Forrestel, Clayton and Nelson. The defense advisers were Kirkland and Packard. The testimony lasted until approximately 4:30 p.m., at which time the Committee deliberated until approximately 7:30 p.m.

Much of the testimonial portion of the hearing was taped. A transcript of the hearing and the original tape have been made available to the court and I have reviewed them. Various portions of the hearing were not taped, but I do not find the omissions material to a review of this matter. The following portions of the hearing were not recorded: the Committee's visit to the laboratory, Mr. Shield's refusal to allow Clayton to call Ms. Maine again, Clayton's application to have the charges against Nelson dropped, the defense adviser's request to have Clayton recalled to rebut statements made by Varrin upon his recall and the denial of that request by Shields, the Committee's refusal to allow the defense advisers to resummarize following Varrin's rebuttal testimony, and Mr. Shields' instructions to the defense advisers at the outset of the hearing that they "cooperate" with the Committee. These omissions were, however, not willful

and did not materially affect Mr. Clayton's rights.

In keeping with the requirements of the Honor Constitution and the practices of the Committee, the witnesses were called to testify separately and outside of the presence of Clayton and Nelson, who also testified separately. All of the witnesses were questioned by members of the Committee and by the defense advisers, Packard and Kirkland.

Although the hearing was not conducted with the strict formality of a judicial proceeding, having reviewed both the transcript and the hearing tapes, the Court finds that the hearing was conducted with more than sufficient decorum and seriousness to satisfy the requirement of the Honor Constitution that the hearing be "formal." No greater formality could be required in such an academic context.

As previously noted, Shields took a very active role in running the hearing and questioning the witnesses, but I do not find that Shields overrode Marx's role as chairman of the Committee. I also find that the evidence does not support plaintiff's contention that Shields came into the hearing ready to convict.

Varrin was the first witness. The gravamen of his testimony was that, after Clayton and Nelson had turned in their papers and the teaching assistant, Maine, had left the room, Clayton looked in a notebook, took back his paper and then scratched out one answer and wrote in the word notochord, which is the correct answer to question 19. Varrin was quite certain and consistent in his testimony on this issue, never expressing any doubt that he had seen Clayton cheat.

Another thing which I definitely saw, at some point, was one of those students—I guess it was the guy Bob—cross out an answer, write in and say verbally what that answer he was writing was. There's no question about that. I heard him say the answer. I could see his hand scratch it out. I could see his paper. I mean I was close enough at that point to see that he had already—I

believe that already even changed the answer once before. In other words, there was already one answer scratched out, you know, and then he scratched this one out again and wrote in his word notochord which is the sort of backbone of the amphioxis. He did this after having looked at his notebook—because I'm absolutely positive of that." Hearing Transcript 6:5 to 19.

\* \* \* \* \* \*

I think in most cases if I was not so sure I think I would really think about, you know, whether or not to (indiscernible). But there's absolutely no question in my mind in this case. I've no reason to (indiscernible). I'm not having a great problem in this course. The act was just so blatant. I was upset about it—the blatantness. I've never seen anybody in my life in high school or kindergarten cheat so blatantly. I can see where the incidents are very, very close—could be very, very closely related to somebody who told the answer. There's a fine line between what I was seeing and what I believed I saw and what may have happened if he had not cheated, okay? And, I would have to admit to you that all right, it could have gone either way in many situations. But in this case, there's no question in my mind that this was a violation of the code. I can't say it strongly enough. Hearing Transcript 54:10 to 55:4.

In contrast to his certainty about the act of cheating, Varrin did express uncertainty about the precise location of the participants as the events unfolded.

Varrin also expressed some uncertainty about Nelson's activity. He did not see Nelson change any answers, but thought that Clayton might have asked him to watch the door and that he had seen Nelson close to Clayton when Clayton and he looked through a book and when Clayton cheated. At the very least, Varrin thought that Nelson had witnessed Clayton's blatant act of cheating.

Varrin was questioned by members of the Committee and by Kirkland and Pack-ard, whose questioning appeared to be directed at demonstrating the inconsistencies in his testimony.

Varrin's testimony was followed by Professor Mahoney, who acted as a character witness. During his testimony, Professor Mahoney told the Committee that, once Clayton and Nelson had received written notification of the charges, he had advised them to proceed. He raised no question about the Committee's jurisdiction or Shields' bias. Professor Mahoney was followed by Maine, who described her observations during the portions of the examination during which she was in the room. Maine testified that, when she received Clayton's paper, she placed it face down on her desk. Maine was followed by Forrestel, another character witness.

Clayton's testimony followed Forrestel's. Clayton consistently maintained his innocence during his testimony. He told the Committee that, after handing in his paper, he had been uncertain about the answer to the last question, number 19. He unsuccessfully attempted to find it in Nelson's notebook. He maintained that he then asked Nelson, who responded "notochord." After ascertaining that Nelson was certain, Clayton testified that he checked his answer, but did not pick up or move the paper on Maine's desk. Clayton denied that he changed the last answer to "notochord" after checking with Nelson—rather he claimed he had changed the answer in the normal course of the examination.

Shortly after Clayton began his testimony, Shields outlined the testimony which Varrin had given, even though Shields thought that Kirkland and Packard had probably already done so. In fact, Kirkland had not done so, because he saw no change from what Clayton already knew about Varrin's accusation.

Clayton testified that he had never seen the accuser before and that there was no reason for him to make a false accusation.

In response to a question by Packard, Clayton testified that he did not speak to Nelson until after Shields and Marx had

spoken to Nelson because he had been told not to call Nelson. The purpose of the exchange was to convince the Committee that their versions of the event were independent.

In giving the testimony, Clayton was deliberately misleading the Committee. At the time, neither Packard nor Kirkland knew that Clayton and Nelson had, in fact, spoken to each other during the interval between the visit to Clayton and the visit to Nelson, having been told by Clayton and Nelson that they had not done so.

During his testimony, Clayton voluntarily signed the honor pledge on his paper. At the time, the Committee told him that no adverse inference would be drawn from his failure to have done so, something which the Committee might have been permitted to do by the Honor Constitution.

Prior to his testimony, but after the hearing began, Clayton signed a statement that he had been informed of his Honor Constitution rights. That document is no longer available. Although Clayton denied actually signing such a document, he has admitted that he agreed to do so. While Clayton claimed at trial that he was not then aware of his rights and so did not understand the document, the court finds that he had actual and constructive knowledge of those rights, especially since he has admitted consulting the Honor Constitution himself in preparation for the hearing. Technically, such a statement should have been signed before the hearing began (Article IV, Paragraph 5 of the Honor Constitution), but the Court finds that the delay caused no prejudice to the plaintiff, since he did agree to sign the statement.

Nelson followed Clayton in testifying before the Committee. Nelson voluntarily signed the honor pledge when asked to do so at the beginning of his testimony, having been assured that no adverse inference would be drawn from his failure to sign at the time the test was given. Nelson was told that he was "at the very least a witness in the case and possibly implicated by giving aid according to the accusation...." The Clayton and Varrin testimony was briefly described to him. Nelson's substantive testimony was virtually identical to Clayton's.

■ Plaintiff has attempted to portray the Honor Committee's accusation of Howard Nelson as an abrogation of Clayton's right to call witnesses on his behalf. Plaintiff alleges that Nelson's testimony, which was entirely exculpatory with respect to Clayton, was tainted by his status as a possible Honor Code violator. This "taint" was unfair because, plaintiff alleges, Nelson was not properly appearing at the hearing under the Honor Constitution in the first place because he had not been formally accused of violating the Honor Code.

I find no merit at all in this argument. Nelson's testimony was not accorded any less weight because he was an accused, and Nelson was properly before the Honor Committee. There was no encroachment on Clayton's right to call witnesses on his behalf.

Following Nelson's testimony, the members of the Committee and the defense advisors visited the laboratory in which the examination took place. Since no testimony was taken, this event is not reflected in the hearing tapes. The purpose of the visit was evidently to clarify the size of the room, since distances and fields of vision had become an issue during the hearing. During the visit, there was a discussion of how the events might have happened. In visiting the laboratory, the Committee was clearly attempting to do a thorough job in fulfilling its responsibilities.

While at the laboratory, Kirkland felt that members of the Committee expressed surprise at the smallness of the room. Kirkland, on the other hand, attempted to demonstrate that "the line of sight was not all that good" and that Varrin could have been mistaken. During the walk back from the laboratory, Packard and Kirkland spoke to Bailinson, who indicated that the room was much smaller than he had thought and that this lent credibility to Varrin's version of the events.

At the end of the hearing, the defense advisers each gave their summations. While Shields' instructions to the defense advisers were not stated in explicitly clear terms, Shields did get the message across and the defense advisers did understand that each of the accused was to be given individual treatment. I find that Kirkland and Packard did a creditable job on behalf of Clayton and Nelson in presenting a coherent, believable theory of the events Varrin thought he saw in the biology laboratory on March 6, 1979.

Kirkland gave the first summation on behalf of Clayton. Kirkland suggested to the Committee that Varrin was mistaken in his perception of the events during the examination and that his recollection was faulty, but that he had become psychologically "locked into a story." Kirkland urged the Committee to question Varrin's entire testimony on the basis of his uncertainty about certain points.

Packard then spoke about both accused students. First, she spoke about Nelson, pointing out that Varrin was unsure of Nelson's actions and that he did not press his accusation that Nelson watched the door. Packard then began to speak on behalf of Clayton as well. She also attacked Varrin's credibility, pointing out possible inconsistencies in his testimony. Packard mentioned that the Committee had two persons' word against one, as did Kirkland.

Then, Kirkland delivered a separate statement for Nelson. There followed a discussion among Kirkland, Packard and the Committee, in which the advisers again urged the Committee to question Varrin's version of the events.

While the defense advisers' summations were somewhat rambling, both defense advisers were thorough and clearly acting as adversaries. I find that they also acquitted themselves well by pointing out the inconsistencies in Varrin's testimony and by bringing all facts favorable to Clayton and Nelson to the Committee's attention.

Because Donna Packard presented a defense of both Clayton and Nelson, I find that Clayton in effect had the assistance of not one, but two able defense advisers. Donna Packard was an experienced defense adviser, she knew the nature of the Honor Committee process due to her experience on the Committee and she made a strenuous effort to seek the truth. Clayton himself even referred to the fact that he had joint advisers in his appeal to President Bowen.

In his testimony, Mr. Kirkland deprecated the quality of his efforts at the hearing. Mr. Shields effusively praised Kirkland's performance. As pointed out above, I do not find that Mr. Clayton was ill-served.

The Committee deliberated from approximately 4:30 to 6:30, at which time Varrin was called to testify again at the request of the Committee. Marx went through the testimony given by Clayton and Nelson and asked for Varrin's response.

During the course of the retestimony, Shields articulated the Committee's concern that Varrin was uncertain of his position and, therefore, the distance at which he had observed Clayton change his answer. Varrin continued to be positive that the answer had been unchanged but uncertain about the location of the three students. However, at Packard's request, Varrin re-enacted the event to demonstrate for the Committee the distance from which he had seen the answer changed. In response to another series of questions, Varrin testified that he could not have seen Clayton's paper when he handed in his own paper because his was given directly to the teaching assistant.

Kirkland and Packard were permitted to ask further questions of Varrin, but cautioned against going over matters already covered.

Shortly after Varrin's testimony, Packard and Kirkland asked to have Clayton and Nelson recalled. Because the Committee did not feel that it was necessary, since their version of the event had been clearly stated, it was suggested that this would not be beneficial. In like manner, the Committee discouraged the advisers from at-

tempting to redeliver their summations. The recall and resummations were not pressed by the defense advisers.

 Although Hamel expressed second thoughts on the recall issue at trial, but not on the fairness of the hearing, the court finds no abuse of discretion in the decision to discourage recall of the accuseds or redelivery of summations. Since Varrin was recalled to answer specific questions by the Committee, the Committee certainly had the discretion to decide what further material it wanted to hear. *Rights, Rules, Responsibilities* specifically provides that the Committee may recall witnesses, but does not require the recall of every witness if one is recalled.

I will not engage in speculation concerning what the Committee's decision would have been had the accused also been recalled.

During the deliberations, there were several "straw polls", which Shields described as a device to determine the preliminary reactions of the Committee members. The first poll resulted in two votes for "leaning innocent", one of which was Shields'. The last poll resulted in only one vote leaning innocent. There was intensive discussion of the merits of the case following each straw poll. Shields' leaning innocent vote was primarily motivated by a desire to ensure thorough discussion of the issues before a final vote.

Within one hour of the completion of Varrin's testimony, the Honor Committee took its final vote. The total deliberations having lasted approximately three hours. The members voted in reverse order of seniority, which meant that Shields and Marx voted second to last and last, respectively. The Honor Constitution required a unanimous vote for a conviction, and all five members who sat voted to convict Clayton and acquit Nelson. In voting to convict, the Honor Committee applied a reasonable doubt standard.

Clayton was convicted because the Committee members believed Varrin's testimony, as confirmed by the physical evidence

and some of the other testimony. Those Committee members who testified at trial stated that their decision was grounded solely upon the evidence before them and not upon extraneous pressures, such as a desire to placate the faculty. The Court finds no evidence to the contrary, nor is there evidence that any member of the Committee was forced to vote for conviction against his or her will.

Nelson was acquitted because the Committee did not believe there was sufficient evidence that Nelson knew Clayton would change his answer when he and Clayton had the discussion of the answer to the last question. Nelson's having witnessed and failed to report an honor violation was not, in itself, a violation of the Honor Constitution.

At approximately 8:00 p.m., Clayton and Nelson appeared before the Committee, individually, to hear the results of the deliberations. The Committee recommended its least severe penalty, a one year suspension from Princeton, to the President of Princeton, William G. Bowen ("President Bowen").

After the verdict was delivered, Varrin, who had independently visited the laboratory following his second testimony, returned to the building at which the Committee was meeting. Varrin spoke to Kirkland and expressed a desire to add to his testimony. When Kirkland learned that Varrin intended to strengthen his testimony, he told Varrin that Clayton had been convicted and that his testimony would not be needed. Had Varrin testified, he would have told the Committee that he had resolved his doubts about the location of the various participants in the laboratory.

Following the hearing, the Honor Committee, through its Chairman, Marx, prepared a letter to President Bowen, notifying him of its decision with respect to Clayton. The letter was accompanied by a brief statement of its findings, in which the Committee found that Clayton had learned the correct answer to the last question from Nelson. Although Varrin had stated in his letter of accusation that the correct answer

was found in a laboratory manual, the Committee was uncertain that this had been the case. The central point of the honor violation, that Clayton changed an answer after handing in his paper and learning the correct answer from another source, was the same in the letter of accusation and the Committee's finding. This was the essence of the offense with which Clayton was charged and of which he was found guilty.

## CLAYTON'S APPEAL TO PRESIDENT BOWEN

After hearing the Committee's decision, Clayton returned to his room and contacted his parents. For the next five days, Clayton, his father, Professor Mahoney and Professor Jamieson W. Doig worked on an appeal to President Bowen. Professor Mahoney was the principal drafter of the appeal. During this period, Clayton's father was in contact with an attorney, but chose not to involve him directly in the appeal process.

Also during this period, Clayton and his father were in contact with T. Dennis Sullivan ("Sullivan"), Assistant to the President. Sullivan advised them about the appellate process and provided them with copies of the hearing tapes.

In outlining the alleged procedural irregularities, Clayton also had the assistance of Kirkland, Packard and Nelson, each of whom contributed statements to the appellate document. Clayton used his copy of *Rights, Rules, Responsibilities*, the hearing record and the attachments to the appellate document in preparing his appeal.

On March 15, 1979, Clayton delivered a Detailed Statement of Appeal ("Detailed Statement") to President Bowen together with a cover letter. In the cover letter, Clayton told President Bowen that the Detailed Statement contained "the detailed reasons" why he believed that the procedures of the Honor Committee had been improper. The Detailed Statement included two general areas, lack of adherence to procedural requirements and "judicial bias."

Following his receipt of the Detailed Statement, President Bowen asked Sullivan to contact Marx and request the Honor Committee to prepare a response. Hamel prepared a preliminary draft which was then modified by Marx and submitted to President. Because Shields had been singled out for criticism in the Detailed Statement, he did not participate in the preparation of the Committee's response, but he submitted his own response to the Detailed Statement. Clayton received a copy of these responses and analysed them.

In addition to the Detailed Statement, the Honor Committee response and the Shields response, President Bowen received a letter from Professor Mahoney concerning alleged procedural violations and letters from two friends of Clayton, which were in the nature of character references.

During his consideration of Clayton's appeal, President Bowen met with Clayton, Professor Doig and Professor Mahoney at different times to discuss the appeal.

Plaintiff contends that the Committee misrepresent the record to President Bowen. This is simply not so. It is true that Hamel represented to President Bowen that the entire hearing was on the tapes, but the tape recorder was not actually turned on all the times Hamel thought it was. This was an honest mistake on his part and of little consequence to President Bowen's review. President Bowen had the opportunity to review the entire tape recording, and he could have questioned any of the participants in the hearing about any portion thereof. Clayton also had an opportunity to review the tapes and he could have pointed out any material omissions in the tapes or the Committee's statements to President Bowen.

Besides assisting President Bowen in accumulating the documentation necessary to consider Clayton's appeal, Sullivan listened to all of the hearing tapes, in order to assess Clayton's contention that the Committee had not conducted itself properly during the hearing and that Shields had dominated the hearing. Subsequently, Sul-

livan played selected portions of the tapes for President Bowen in order to let him actually hear critical portions of the tape in relation to Clayton's contentions on the appeal.

After having accumulated and reviewed the documentation and meeting with Clayton, President Bowen met with Sullivan at his home to discuss the appeal. The meeting lasted several hours. During that time, President Bowen and Sullivan discussed the appeal in detail and listened to excerpts of the tapes. Finally, President Bowen drafted a letter to Clayton, denying the appeal. Subsequently, after further consideration by President Bowen and his consultation with the Counsel to the University, the letter was finalized and delivered to Clayton on or about March 25, 1979.

At trial, President Bowen described his appellate standard of review as follows:

The standard of review that I set for myself was first to determine whether Mr. Clayton had received the basic protections, assurances of his rights as specified in the Constitution of the Honor System of the University. I undertook to determine whether he had been treated in a fair manner, whether the tenants of fundamental fairness as I understand it, and as the Constitution describes them, had been adhered to. That was the first question for me.

The second question for me was whether the penalty was an appropriate one under our arrangements. The President is empowered to reduce penalties if he sees a reason to do so, but not to increase them. So I was then concerned with the appropriateness of the penalty.

In his letter to Clayton, President Bowen stated his conclusion that Clayton had not been deprived of important protections, that any procedural errors had not rendered the overall process unfair, that there was no reason to overturn the unanimous finding of the committee and that the recommended penalty was appropriate.

■ Having heard the testimony and reviewed the documents reviewed by President Bowen, the court finds that the Clay-

ton appeal was given serious and conscientious consideration by President Bowen and his staff, and that the result which he reached was supported in the record before him.

I was very impressed by the careful and painstaking review President Bowen made of the Honor Committee's actions. He and his assistant, Mr. Sullivan, examined all of the same issues this court has found to be of any significance and came to the conclusion that Robert Clayton was treated with fundamental fairness. I categorically reject plaintiff's attempt to characterize President Bowen's review as that of a rubber stamp.

## OTHER ISSUES RELATED TO THE HEARING

In support of an offer of proof that Shields intimidated Marx to vote against Clayton, the plaintiff was permitted to introduce testimony that accusations of academic wrongdoing had been made against Marx.

Before the Clayton hearing, there were vague rumors concerning Marx from persons associated with two individuals about to come before the Committee. Because of their source and the vagueness of the rumors, they were dismissed by the Committee.

Following the Clayton hearing, in late April or early May of 1979, these accusations were renewed by the same individuals and other individuals who were friends of Clayton, including Forrestel, who had been a witness at the Clayton hearing. At this time, the accusations were more specific. Shields asked Hamel, Bailinson and Thomas to investigate them thoroughly. The investigation revealed that no individual was willing to make a formal accusation or appear as a witness before either the Honor Committee or the Faculty-Student Committee on Discipline. No further action was taken by the Committee members because they could not proceed without an individual willing to make a formal accusation and appear as a witness.

There has been no evidence before this court that Marx was, in fact, guilty of any academic dishonesty or that he was actually aware of these accusations. Nor has there been any evidence to support an inference that these accusations played any part in the Clayton matter. Certainly, there is no evidence that they were used by Shields to intimidate Marx into voting to convict Clayton, the original offer of proof. The court finds that these were groundless accusations which played no part in the proceedings against Clayton, and that the Committee acted responsibly in investigating them.

Plaintiff also characterizes Clayton's conviction as the result of the Honor Committee's effort to resurrect the honor system as a result of perceived faculty disillusionment with the Honor Code at Princeton. Shields and Hamel were the principal authors of an Honor Committee Report in which the Honor Committee recommended retaining the Honor System at Princeton in spite of the lack of confidence the Committee thought the faculty had in the system.

Shields and Hamel did not make Clayton a scapegoat for purposes of saving the Honor Committee. There were three other members of the Honor Committee who voted to convict, and I am convinced that all five members of the Committee carefully examined the facts of this particular case to come to their own conclusion. The members of the Committee voted to convict because they believed Clayton was guilty and not because they were out to justify the existence of the Honor System. This was not a "Dreyfus" case.[3]

Plaintiff also raises defendant's alleged failure to supervise or otherwise control the Honor Committee as a violation of Mr. Clayton's right to review under the Honor Constitution. The System, as established by Princeton and agreed to by Clayton when he matriculated at Princeton, is a student run Honor System with review by the President of the University. As I already stated, I was deeply impressed by the careful, thorough and thoughtful investigation President Bowen and his associate conducted of Clayton's conviction.

I do not find that the Honor Committee operates in either an uncontrolled or unsupervised manner. Certainly the appellate process affords a convicted student a presumptively viable avenue for review.

As discussed earlier, it is also not this court's role to judge the propriety of the system Princeton chooses to employ to police cheating in its student body. Entrusting members of the student body to investigate and adjudicate the alleged malefactions of their fellow students is no sin. In the absence of egregious behavior on the part of the entrusted body, Princeton's action can be viewed commendably as a vote of confidence in the maturity of the student body.

## CONCLUSIONS OF LAW

Jurisdiction in this action is based upon diversity of citizenship, 28 U.S.C. § 1332. New Jersey law governs this action.

The initial issue to be addressed is what a court of law's proper standard of review should be in considering disciplinary actions taken by a university. I note that any constitutional issues raised in the complaint have either been disposed of by summary judgment, *see Clayton I* at 810, or are no longer being pursued.

There are at present no New Jersey Supreme Court decisions directly addressing the role of courts of law in reviewing academic disciplinary actions, although there are a number of decisions that provide meaningful guidance on the issue. The task of this court under *Erie Railroad v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), and its progeny, is to make an informed prediction as to how the New Jersey Supreme Court would rule on this issue were this same case before it.

---

**3.** In 1894, Captain Alfred Dreyfus was unjustly convicted of treason and sentenced to degradation and imprisonment on Devils Island. Some prominent individuals resorted to perjury and intimidation in the higher interest of patriotism and piety. In 1906, the Supreme Court of Appeals completely cleared him and he was reinstated with honor.

*See Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1167 (3d Cir.1981); *Becker v. Interstate Properties*, 569 F.2d 1203, 1204–6 (3d Cir. 1977).

In my prior ruling in this case, a motion for summary judgment, I found as a matter of law that New Jersey courts "would provide some measure of protection to Mr. Clayton's status as a member in good standing of Princeton's academic community." *Clayton v. Trustees of Princeton University*, 519 F.Supp. 802, 805 (D.N.J. 1981) (*Clayton I*). In determining which standards would be applied in reviewing a student disciplinary matter, I held that Princeton should be held to substantial compliance with the procedures it established for itself. *Clayton I* at 806.

In reaching that result, I examined the New Jersey law of associations as enunciated by the New Jersey courts up to that time, and concluded that the New Jersey courts would approach this case in a manner similar to that taken in *Tedeschi v. Wagner College*, 49 N.Y.2d 652, 427 N.Y. S.2d 760, 404 N.E.2d 1302 (Ct.App.1980). I stated, "If Mr. Clayton can demonstrate that Princeton materially breached its procedures in deciding to suspend him then he will be entitled to some form of relief from this court." *Clayton I* at 806.

I now find that this statement of the law is incorrect and a New Jersey state court would not apply the "substantial compliance" test outlined in *Clayton I*. While the Supreme Court of New Jersey has not spoken directly on this point, I believe that they have given sufficient guidance so as to permit me to conclude that my original prediction of the law was flawed. As the Third Circuit stated in *Becker*, a federal court's prediction of state law "cannot be the product of a mere recitation of previously decided cases ... [rather], ... a federal court must be sensitive to the doctrinal trends of the state whose law it applies, and the policies which inform the prior adjudications by the state courts." *See Becker* at 1205–1206.

Since my decision in *Clayton I*, the New Jersey Supreme Court has clarified the law further as to the standards a court of law is to use in reviewing disciplinary actions of private associations. In *Chavis v. Rowe*, 93 N.J. 103, 459 A.2d 674 (1983), the court held that judicial inquiry into the removal procedures followed in the "defrocking" of a church deacon would intrude impermissibly on matters of church doctrine and polity. *Chavis* at 110, 459 A.2d 674. While the court did not reach the merits of the case because to do so would have involved the court in scrutiny of Biblical laws and church doctrine, the court did in dicta reaffirm that New Jersey law allows courts to inquire into disciplinary procedures of private associations where there has been an accroachment of a judicially-protectible interest. *Id.*

In an opinion released the same day as *Chavis*, the court was much more specific in delineating the nature of this judicial inquiry into the disciplinary actions of private associations. In *Rutledge v. Gulian*, 93 N.J. 113, 459 A.2d 680 (1983), the New Jersey Supreme Court reviewed the suspension of a member from the Most Ancient and Honorable Society of Free and Accepted Masons of New Jersey. In holding that judicial intrusion into Masonic procedures should be confined to procedures that are fundamentally unfair, the court stated:

> In determining whether a private organization is bound by its established procedures, we would again balance the organization's interest in autonomy and its reason for straying from its rules against the magnitude of interference with the member's interest in the organization and the likelihood that the established procedures would safeguard that interest.
>
> In this regard we note that a private organization has a great interest in controlling its own affairs. A fraternal order may require considerable freedom from regulation because 'its function of providing a place for congenial social intercourse cannot be fulfilled unless it has

the power to control membership in those terms.' 'Developments in the Law—Judicial Control of Actions of Private Associations', 76 Harv.L.Rev. 983, 991 (1963). Professor Chafee noted that the health of society will usually be promoted if the groups within that serve the industrial, mental, spiritual and social needs of citizens are genuinely alive. 'Like individuals, they will usually do most for the community if they are free to determine their own lives for the present and future.' *Chaffee, supra*, 43 Harv.L.Rev. at 1027 (1930). *Rutledge* at 123, 459 A.2d 680.

Turning to the case at hand, I must at the outset examine whether Clayton has a judicially protectible interest before turning to the standard of review of any accroachment of that interest. After examining *Chavis, supra*, and *Rutledge, supra*, I find that my earlier ruling in this case that Clayton had a judicially-protectible interest was correct. *See Clayton I supra*, at 804–805. As I stated there:

> [t]he defendant would hardly deny that there is a certain cachet to an undergraduate degree from Princeton University. Nor can it reasonably be denied that the value of the degree is impaired by the presence of a notation of disciplinary suspension on the academic transcript. It is undisputed that Princeton's action in suspending Mr. Clayton has had a significant impact upon his status as an honorable member of the academic community. *Clayton I* at 805.

The *Rutledge* court affirmed this view, stating:

> the member's valuable personal relationship to the organization [is] the true basis for judicial relief against wrongful expulsion, [and] the status and professional recognition conferred by membership in a professional organization [warrant] at least a limited judicial examination of the reason for plaintiff's expulsion. *Rutledge, supra* 93 N.J. at 118–119, 459 A.2d 680.

Thus, as Clayton does have a judicially-protectible interest, I turn now to the role this court should play in protecting that interest.

Before examining whether Princeton was in substantial compliance with its own procedures, the teaching of *Rutledge* mandates that I apply a balancing test to determine whether Princeton is bound by these established procedures. Princeton University's interest in autonomy and its reason for straying from its rules must be balanced against the magnitude of interference with Clayton's interest in Princeton and the likelihood that the established procedures would safeguard that interest. *Rutledge, supra* at 123, 459 A.2d 680. This test properly takes into account both the interest of the individual and the institution.

The *Rutledge* court considered both my decision in *Clayton I, supra*, and that of the New York Court of Appeals in *Tedeschi, supra*, but stated:

> A private organization is not in all instances bound by its internal rules. The theory that the rules constitute a contract between the member and the organization has fallen into disrepute, ... and while the member presumably has a reasonable expectation of receiving fair treatment, it is not necessarily the case that he expects that a particular set of rules must at all times be followed. The threat of arbitrary action looms as the rules loosen, but such danger may be met as it arises.

*Rutledge* at 123, 459 A.2d 680.

Two relatively recent New Jersey decisions discuss the nature of Princeton University's interest in autonomy as against the interest of an individual who violated one of Princeton's regulations. In *State v. Schmid*, 84 N.J. 535, 423 A.2d 615 (1980), Schmid, a member of the United States Labor Party, was distributing and selling political materials on the main campus of Princeton University. He was arrested and charged by the University with trespass upon private property. Following conviction under the State's penal trespass statute, he challenged his conviction on the grounds that his state and federal constitu-

tional rights to freedom of speech and assembly were violated. The New Jersey Supreme Court reversed Schmid's conviction because at the time of the arrest, Princeton did not have any reasonable regulatory scheme designed to protect both the legitimate interests of the University as an institution of higher education and the individual exercise of expressional freedom. *Schmid* at 567–68, 423 A.2d 615. In addressing the interests of Princeton in dealing with disciplinary infractions on its property, the Court stated:

> ... we must give substantial deference to the importance of institutional integrity and independence. Private educational institutions perform an essential social function and have a fundamental responsibility to assure the academic and general well being of their communities of students, teachers and related personnel. At a minimum, these needs, implicating academic freedom and development, justify an educational institution in controlling those who seek to enter its domain. The singular need to achieve essential educational goals and regulate activities that impact upon these efforts has been acknowledged even with respect to public educational institutions. ... Hence, private colleges and universities must be accorded a generous measure of autonomy and self governance if they are to fulfill their paramount role as vehicles of education and enlightment.
>
> *Schmid*, 566–567, 423 A.2d 615 (citations omitted).

Subsequently, in *Napolitano v. Princeton University Trustees*, 186 N.J. Super. 548, 453 A.2d 263 (App.Div.1982), the Appellate Division reaffirmed the unique relationship between a student and a university. It is a well-settled principle that a state appellate decision can be binding on a federal court in a situation such as this one. As the United States Supreme Court has stated:

> [T]he highest state court is the final authority on state law, ... but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and apply that law even though it has not been expounded by the highest court of the state.... An intermediate state court in declaring and applying the state law is acting as an organ of the state and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.
>
> *Fidelity Union Trust Co. v. Field*, 311 U.S. 169, 177, 61 S.Ct. 176, 178, 85 L.Ed. 109 (1940).

Plaintiff Gabrielle Napolitano had her academic degree withheld for one year as a result of a determination by the Faculty-Student Committee on Discipline that she had plagiarized parts of a research paper done for a Spanish course. The Appellate Division found that Napolitano's due process rights were not violated either by the procedures Princeton followed or the penalty she received.

In commenting on Princeton's interest in autonomy, the *Napolitano* court quoted extensively from *Schmid, supra,* and then went on to say:

> We do not believe, however, that the law of private associations delineates completely the relationship between a student and a university. The relationship is unique. The status of a private university such as Princeton was referred to by Justice Handler in his opinion for the court in *State v. Schmid*, 84 N.J. 535, 423 A.2d 615 (1980), in these terms:
>
> > A private educational institution such as Princeton University involves essentially voluntary relationships between and among the institution and its students, faculty, employees, and other affiliated personnel, and the life and activities of the individual members of this community are directed and shaped by their shared educational goals and the institution's educational policies. [at 552, 423 A.2d 615]
>
> The student comes to the academic community (the university) seeking to be educated in a given discipline. The stu-

dent pays a tuition which might, in some instances, represent a contractual consideration. The university undertakes to educate that student through its faculty and through the association of other students with that student and the faculty. *Napolitano, supra,* 186 N.J.Super. at 565, 453 A.2d 263.

After citing numerous cases warning against a rigid application of the law of contracts to student disciplinary proceedings, the court stressed, "[t]hese cases, while recognizing the rights of students, emphasize the independence that should be accorded to a university to permit it to exercise properly educational responsibility." *Napolitano* at 566, 453 A.2d 263.

Plaintiff seeks to distinguish *Napolitano* on the basis that the case involved academic standards and not disciplinary rules. The *Napolitano* court, indeed, noted that "we regard the problem before the court as one involving academic standards and not a case of violation of rules of conduct." *Napolitano* at 567, 453 A.2d 263, and part of the court's reasoning was based on the deference courts should show to the expert opinion of faculty members in academic judgments. *Napolitano* at 569, 453 A.2d 263, *citing Board of Curators, University of Missouri v. Horowitz,* 435 U.S. 78, 98 S.Ct. 948, 55 L.Ed.2d 124 (1978). I find, however, that this emphasis on academic standards does not undermine the policy of substantial deference to the decision making process of a private university.

Although *Napolitano* stressed the academic nature of the matter under review, the court's main emphasis was on the unique role of a university and the need to maintain the institution's autonomy so that it could fulfill its unique role to its fullest extent. The Appellate Division was not concerned simply with the academic expertise brought to bear in a plagiarism investigation.

In addition, the *Napolitano* court emphasized that the law of associations in New

Jersey has, in general, always afforded deference to the internal decision-making process of a private organization. *See Napolitano* 186 N.J.Super. at 570, 453 A.2d 263, *citing Higgins v. American Society of Clinical Pathologists,* 51 N.J. 191, 202, 238 A.2d 665 (1968).

In *Schmid, supra,* the court fashioned a multifaceted test under the state constitution's freedom of speech and assembly clauses where the interest of the private property owner were balanced against the expressional activity sought to be undertaken on that property. *Schmid* 84 N.J. at 562–63, 423 A.2d 615. In examining Princeton's primary use of its private property, the court emphasized Princeton's need for independence in order to achieve its educational goals, even in the face of an individual's constitutional right of expression. Although Schmid's conviction for trespassing was reversed, it was due to the lack of any reasonable standards for governing the exercise of expressional freedom and not because Schmid's associational rights were greater than Princeton's right to independence in regulating such matters. The court specifically noted that Princeton's revised regulations protect their institutional integrity while accommodating the public. *Schmid* at 568, 423 A.2d 615.

A similar situation is presented by the instant case. Princeton's institutional integrity is not only interwoven with the usual need for an academic institution to police cheating by its students, but is inextricably and uniquely interwoven within its Honor Code. As I stated earlier, the Honor Code, as it is presently in effect at Princeton, dates as far back as 1893. While there may be considerable debate within the Princeton community as to whether the Honor Code should be rebuilt,[4] it is not proper for this court to be the architect.

I conclude then, that Princeton's interest in autonomy is extremely strong. In stat-

---

**4.** *See, e.g., Princeton's Honor Code Challenged by Student,* **NEW YORK TIMES**, Feb. 25, 1985, p. B4, col. 1.

ing this, I do not minimize Robert Clayton's interest in the organization. As I stressed earlier in ruling that Clayton had a judicially-protectible interest, his suspension greatly impairs the value of his degree from Princeton and tarnishes his reputation in that community. Because of the magnitude of his stake here, Princeton must have established procedures for safeguarding that interest, and, if it strays from its own rules, Princeton must have good and sufficient reasons for doing so.

██ As is clear from my findings of fact, Princeton has established a broad array of procedures intended to give those accused of cheating a fair hearing. Princeton gives all students notice of and extensive information concerning the Honor System when they arrive at the University; the members of the Honor Committee are essentially selected by their peers; those accused of violating the Honor Code are given a full hearing with a right to a letter of accusation, a right to a defense adviser, a right to present and cross examine witnesses, and a right of review by the President of the University.

I believe that these procedures were adequate to safeguard a student from being unfairly convicted of cheating. Indeed, I was impressed throughout this trial by the integrity and concern of all participants that the procedures to be followed by the Honor Committee be carried out diligently and fairly. Clayton's hearing was, of course, not the equivalent of a trial before a judicial tribunal, but it was an impartial, fair proceeding with basic due process protections. Simply stated, I believe that Robert Clayton got a fair shake.

Plaintiff points to numerous areas where he believes Princeton strayed from its own rules. As detailed in the findings of fact, I either do not agree with plaintiff that the rules were not followed, or I find any deviation from the established procedure to be of a *de minimus* import.

The role of the defense adviser was carried out as it was generally understood on the Princeton campus and in the Honor Constitution. The fact that their concep-

tion of the adviser's role differs from the normal role of defense counsel in a court of law does not mean that Princeton's conception is infirm in any way.

After an extensive review of all the testimony, I find that President Bowen's testimony summarized this issue most accurately and eloquently. He stated:

> The University is an institution which proceeds very much on the basis of freely given cooperation, and ... with a very limited set of punishments ... for being sure that conduct stays within certain specified bounds. There are, of course, rules and regulations of a general kind that we do our best to uphold. But we do not have a whole set of arrangements concerning perjury or whatever that guide and protect the proceedings of a court of law.... And since we do not have that whole panoply of protections ... or means of enforcing those guidelines, we do expect advisers who are meant to be peers and not meant to be attorneys, to be direct and clear, helpful, [and] not deliberately misleading in their relationship to the Committee and to the University. And so I suppose there are some differences that might follow from the fact that we are not a court of law with all of the attendant rules, procedures, protections that are important to the way a court functions. [Testimony of William G. Bowen, October 7, 1983 at 17.]

I agree.

Looking at other alleged infirmities plaintiff has raised, I have also found the Committee's loss of its prior records and its failure to adequately tape record all of the hearing to be of little significance to the question of whether Clayton was accorded basic procedural fairness.

The 16 hour notice via the letter of accusation instead of 24 hour notice was of so little significance that Clayton himself turned down an offer to postpone the hearing so as to comply with the 24 hour notice requirement. Princeton's justified interest in autonomy is too great for this court to

reduce the question of whether Clayton was accorded fundamental fairness to an application of a mathematical formula.

In all other respects, I have not found that Princeton deviated from its own established regulations.

In conclusion, Princeton places great reliance in the Honor Code and attaches considerable sanctity to it. It does not behoove this court to tell any private institution how they should handle alleged cheaters as long as the dictates of fundamental fairness are met. Clayton knew about the Honor Code when he arrived, and he was found to have violated it. If the Code needs correction, it is for Princeton to correct, and not this court.

I accordingly find no reason to grant plaintiff the relief he seeks. An order accompanies this opinion.