JOHN R. RUTLEDGE, JR., PLAINTIFF-RESPONDENT, v. RICHARD S. GULIAN, HARRY E. BESLEY, KENNETH L. LARSEN, EDGAR N. PEPPLER AND EDWARD RAINEY, INDIVIDUALLY AND AS AGENTS OF THE GRAND LODGE OF THE MOST ANCIENT AND HONORABLE SOCIETY OF FREE AND ACCEPTED MASONS FOR THE STATE OF NEW JERSEY, BENJAMIN H. PRIEST, CHARLES H. HOENS, AND THE GRAND LODGE OF THE MOST ANCIENT AND HONORABLE SOCIETY OF FREE AND ACCEPTED MASONS FOR THE STATE OF NEW JERSEY, A NEW JERSEY CORPORATION, DEFENDANTS-APPELLANTS.

Argued December 6, 1982—Decided May 10, 1983.

*Charles H. Hoens, Jr.,* argued the cause for appellants (*Lum, Biunno & Tompkins,* attorneys; *David C. Dreifuss,* on the briefs).

*John R. Rutledge, Jr.,* argued the cause *pro se.*

The opinion of the Court was delivered by

CLIFFORD, J.

This case presents a challenge to judicial intervention in the internal disciplinary proceedings of the Most Ancient and Hon-

orable Society of Free and Accepted Masons of New Jersey (Masons). At issue is whether membership in a fraternal organization warrants judicial protection from unreasonable interference and, if so, what constitutes such unreasonable interference. The trial court, finding that the plaintiff's suspension from the Masons violated the Masonic Code for Trials, ordered plaintiff reinstated and also enjoined the Masons from imposing punishment other than as prescribed in the Code for Trials. The Appellate Division modified and affirmed that determination. We granted certification on defendants' petition, 91 *N.J.* 196 (1982), and denied plaintiff's cross-petition, 91 *N.J.* 197 (1982). We reverse.

I

The Masonic fraternity is composed of local lodges throughout the state and a Grand Lodge, whose members are the current and former elected officials of the local lodges. The Grand Master heads the society. Provisions known as Landmarks, which may not be amended or revised, embody the governing principles of the Masons. Landmark 3 empowers the Grand Master to "suspend, at his pleasure, the operation" of any Masonic rule or regulation other than a Landmark; to "create lodges by his warrant and arrest the warrant of any lodge"; and to "convene a lodge at any time or place and do Masonic work therein * * *." Landmark 8 subjects every Mason to the jurisdiction of the lodge within whose territory he resides.

The Masonic Code for Trials contains the procedures for internal discipline. Pertinent to this appeal are sections 13–05, which provides that "no brother shall be suspended (except for nonpayment of dues), nor expelled, except after due trial and opportunity to defend himself", and 13–14, which reads in part, "A member of a lodge, or an unaffiliated Mason, is subject to the penal jurisdiction of any lodge within whose territorial limits he may reside."

John Rutledge joined the Masons in 1954 as a member of Harmony Lodge No. 18. In 1975 he was elected to a one year term as Grand Master of the Grand Lodge. Richard Gulian, one of the defendants herein, succeeded him in that position. In 1976, the trustees of the Grand Lodge filed a civil complaint against Rutledge in the Chancery Division, alleging misappropriation of commissions from two travel agencies owed to the Grand Lodge while Rutledge was Grand Master. Trial of that case resulted in a judgment of $18,800 against Rutledge.

While that charge was pending, Gulian, as Grand Master, issued an edict in a letter to Rutledge dated March 11, 1977, forbidding Rutledge from attending the upcoming annual meeting of the Grand Lodge. The purpose of the edict was "to prevent a disturbance of the peace and harmony of the fraternity." Several weeks later, Gulian issued another edict suspending Rutledge from exercising all the rights and privileges of a Master Mason until Gulian's successor was elected in April, 1977. Gulian's successors continued the suspension.

On April 17, 1977, after being physically barred from entering the annual meeting, Rutledge filed a complaint in Chancery Division against the Masons, seeking a judicial order vacating the suspension and authorizing his admission to the annual meeting. The court denied the temporary restraining order because Rutledge had been merely suspended rather than expelled, but retained jurisdiction of the case. It ruled that once a summons was served by Rutledge and an answer filed, a date for filing Masonic charges might be set. Rutledge eventually filed an amended complaint, which the defendants answered. In response to a motion by Rutledge on March 23, 1978, the court noted that "none of the parties is liable for the delay in filing Masonic charges", and ordered that those charges be brought within 30 days of April 11, 1978.

On May 7, 1978, the Grand Lodge filed Masonic charges of misappropriation of funds and un-Masonic conduct against Rutledge, and on September 16, 1978 a trial panel of the Grand

Lodge found him guilty of all charges. The Code for Trials directs that when a member has been found guilty, the member's local lodge meets to impose punishment. The Grand Master, however, suspended operation of the Code and ordered that a special Lodge of Judgment, composed of certain leaders of the Grand Lodge, determine Rutledge's punishment. His purpose was to avoid the schism that might arise should a local lodge undertake to punish a Grand Master for misconduct relating to affairs of the Grand Lodge. For reasons not apparent in the record, no proceedings to impose punishment have yet been instituted against Rutledge either by his local lodge or by the Lodge of Judgment.

Meanwhile, in addition to his suit in the Chancery Division, Rutledge filed an action in the Law Division, seeking reinstatement, compensatory damages for loss of income as a lawyer supposedly caused by the suspension, and punitive damages based on the alleged malice of the Grand Lodge. The two suits were consolidated in the Chancery Division, which, after trial, ordered Rutledge reinstated because his suspension violated the Code for Trials. The court also enjoined defendants from imposing punishment through a Lodge of Judgment or by any procedure other than as ordained by the Code for Trials. In addition, it invalidated Landmark 3 as contrary to public policy insofar as it allowed the Grand Master to contravene the Code for Trials by suspending Rutledge without a hearing and by forming a special Lodge of Judgment. Rutledge's claim for compensatory and punitive damages failed on factual grounds. In a post-judgment order, the court directed defendants to restore plaintiff's name to the Grand Lodge mailing list and to replace his photograph in the gallery of past Grand Masters.

The Appellate Division modified the trial court's vacation of suspension by holding that the suspension was invalid only until September 16, 1978, the date on which the trial panel of the Grand Lodge had found Rutledge guilty of the Masonic charges. It reasoned that once a member has been found guilty of un-Masonic conduct, suspension pending imposition of punish-

ment does not violate the Code for Trials or offend public policy. In all other respects the Appellate Division affirmed the trial court.

## II

In *Higgins v. American Soc'y of Clinical Pathologists,* 51 *N.J.* 191 (1968), this Court analyzed judicial intervention into the affairs of a private organization as follows: (1) does the plaintiff have an interest sufficient to warrant judicial action, and (2) has that interest been subjected to an unjustifiable interference by the defendant? *Id.* at 198. In *Higgins,* the plaintiff, a medical technologist, had been denied recertification by the defendant professional association because she had violated the internal rule that medical technologists may not work for a laboratory that is not run by a licensed physician. The plaintiff had accepted employment at an independent bioanalytical laboratory whose director, although not a physician, was licensed by the State. In evaluating plaintiff's right to relief, the Court began with the proposition that "while courts will not compel admission of an individual into a voluntary association, they have been willing to intervene and compel the reinstatement of a member who has been wrongfully expelled." *Id.* at 199. *Accord Zelenka v. Benevolent & Protective Order of Elks,* 129 *N.J.Super.* 379, 382 (App.Div.1974) *cf. Trautwein v. Harbourt,* 40 *N.J.Super.* 247, 259 (App.Div.), certif. den., 22 *N.J.* 220 (1956) ("the law accords important rights and status to members of voluntary organizations not extended to mere aspirants therein.").

The rights accorded to members of an association traditionally have been assessed in terms of the property interests in the assets of the organization or in terms of contract rights. 51 *N.J.* at 199. The modern trend, however, sees the member's valuable personal relationship to the organization as the true basis for judicial relief against wrongful expulsion. *See generally,* Chafee, "The Internal Affairs of Associations Not for

Profit", 43 *Harv.L.Rev.* 993, 1007–10 (1930). The *Higgins* court noted that "[t]he loss of *status* resulting from the destruction of one's relationship to a professional organization oftimes may be more harmful than a loss of property or contractual rights", 51 *N.J.* at 200 (emphasis in the original), and concluded that the status and professional recognition conferred by membership in a professional organization warranted at least a limited judicial examination of the reason for plaintiff's expulsion. Similarly, the court in *Zelenka, supra,* held that expulsion from the order of Elks warranted judicial review in light of the esteem conferred by membership in that fraternity. Although Rutledge's ability to practice his profession did not turn on his Masonic status, nevertheless this status, attributable to membership in a prestigious, socially-active fraternity, merits protection from unreasonable discomfiture.

It having been determined that Rutledge's membership merits judicial attention, the next question is whether that membership, which was suspended pending trial and is potentially subject to further suspension or expulsion at the hands of a specially-created Lodge of Judgment, has been or will be subject to unreasonable interference. It is well-settled that courts will invalidate an expulsion from a private organization when that expulsion is based on reasons that violate public policy. *Higgins,* 51 *N.J.* at 202; *Zelenka,* 129 *N.J.Super.* at 383. In *Higgins,* we concluded that the internal rule of the American Society of Clinical Pathologists forbidding association with a laboratory not run by a licensed physician ran counter to the legislative determination that the fostering of bioanalytical laboratories run by qualified persons, be they physicians or no, was in the public interest. *Higgins,* 51 *N.J.* at 203. Similarly, the plaintiff in *Zelenka* had been expelled from the Order of Elks because he submitted for publication a letter to a newspaper urging the Elks to eliminate their racial restrictions on membership. The Elks found his conduct violated the internal rule forbidding the circulation of any writing on Elk affairs without permission. The court invalidated the expulsion on the ground

that the rule as applied offended the principle that free discussion of public issues such as racial discrimination of a widespread and socially significant fraternal organization was in the public interest. 129 *N.J.Super.* at 387.

Rutledge has not suggested that the Masons suspended him for reasons violative of public policy. Rather, he claims that the Masons ignored the procedures outlined in the Code for Trials, and asserts that courts should intervene to require a private organization to follow its own rules, a proposition he supports by reference to *Clayton v. Trustees of Princeton Univ.,* 519 *F.Supp.* 802 (D.N.J.1981) (construing New Jersey law). The plaintiff in that case, after having been suspended from Princeton University for cheating on a laboratory examination, argued that Princeton did not follow its own rules in reaching its decision to suspend him, while Princeton argued that the plaintiff was entitled only to basic procedural fairness. The court adopted the position of *Tedeschi v. Wagner College,* 49 *N.Y.*2d 652, 659, 427 *N.Y.S.*2d 760, 764, 404 *N.E.*2d 1302, 1306 (1980), that "when a university has adopted a rule or guideline establishing the procedure to be followed in relation to suspension or expulsion that procedure must be substantially observed." Plaintiff also draws support from *Baugh v. Thomas,* 56 *N.J.* 203 (1970), in which a member of a Baptist Church was, by vote of the congregation, expelled after quarreling with the pastor. The member argued that several of those who voted to oust him were ineligible to vote according to the Church's own well-defined ministerial procedures. This Court held that civil courts had jurisdiction "to determine whether established procedures of a religious organization, as proved, have been followed where a member is expelled from that organization." *Id.* at 208. Rutledge claims that the Masons violated the holdings of these cases by failing to adhere to their own internal disciplinary procedures. Put differently, Rutledge claims his membership has been unreasonably interfered with by virtue of the Masons' failure to follow their established procedures.

■ At the outset, we question whether the Masons ignored established procedures in suspending Rutledge and in creating a Lodge of Judgment, for Landmark 3 explicitly authorizes the Grand Master to intermit any rule or regulation other than a Landmark. Turning first to Rutledge's suspension, it is clear that the pre-suspension hearing requirement is found only in the Code for Trials, not in the Landmarks, and may properly be suspended. The Appellate Division ruled that if Landmark 3 permitted the Grand Master to suspend Rutledge without a prior hearing, the Landmark was invalid because it offended public policy. We disagree. With the suspension of the Code for Trials, the Masons were free to punish Rutledge in any manner they chose, as long as it accorded him fundamental fairness. *See Garrow v. Elizabeth Gen. Hosp. & Dispensary,* 79 *N.J.* 549, 558 (1979).

Rutledge was not denied a hearing, he was merely suspended pending it. He argues that his suspension was intended as punishment because each succeeding Grand Master summarily suspended him without bringing charges until the 1978 court order directed the Grand Master to file charges. Defendants counter that the suspension was not intended to punish Rutledge but rather to prevent disharmony within the fraternity. They attribute the 14 month delay in bringing Masonic charges to Rutledge's failure promptly to file his complaint and effectuate service of process in his suit for equitable relief. Significant to this contention is the trial court's 1978 order directing defendants to bring Masonic charges within the month, wherein the court stated that neither side was responsible for the delay. At any rate, Rutledge also had civil charges pending against him in the Chancery Division concerning the disappearance of $18,800 in Masonic funds, pending the resolution of which the Masons had no small interest in shutting the lodge doors on him.

It is settled law that suspension pending a hearing does not necessarily violate principles of fundamental fairness. Where the public interest requires, courts have recognized an implied power in the State to suspend public employees pending a

hearing. In *D'Ippolito v. Maguire,* 33 *N.J.Super.* 477 (App.Div. 1955), the court upheld the suspension of a policeman even before charges were filed, despite a statutory requirement that a hearing precede a suspension, on the reasoning that the Legislature intended to distinguish between suspension as punishment and as a procedural step to protect the public from the risk of continued misconduct pending investigation and trial. Similarly, *Vanderbach v. Hudson County Bd. of Taxation,* 133 *N.J.L.* 499 (Sup.Ct.1946), aff'd, 135 *N.J.L.* 349 (E. & A.1947), upheld a pre-hearing suspension of the prosecutor, the court noting that the "[i]nability of a public board to separate an inferior officer or an employee from his duties temporarily and in good faith pending trial could work serious impairment in the public service * * *." 133 *N.J.L.* at 509. *See also Romanowski v. Board of Educ. of Jersey City,* 89 *N.J.Super.* 38 (App.Div.1965) (board has inherent authority to suspend business manager indicted for malfeasance in office).

█ These cases demonstrate that in the public sector, the propriety of a suspension pending trial has been judged by balancing the public interest in the suspension against the personal interest with which the suspension interferes. In the private sector, the courts have weighed the competing interests of the parties to determine what procedures fundamental fairness required. For example, *Garrow, supra,* 79 *N.J.* 549, balanced the doctor's interest in hospital staff membership as necessary for the pursuit of his profession against the hospital's fiduciary duty to the public to establish and maintain control over a competent staff before determining that the plaintiff physician was entitled to limited discovery and the right to counsel in the hearing on his application for a staff position at a private hospital. Weighing the competing interests of Rutledge and the Masons, it is clear to us that principles of fundamental fairness did not forbid suspension pending trial. The Masons' interest was great: Rutledge menaced the peace and harmony of the fraternity. On the other hand, Rutledge was not expelled from membership, nor was his membership necessary for the

pursuit of his profession.[1]  On balance, we feel that the suspension of Rutledge did not offend public policy or principles of fundamental fairness.

Moreover, we would reach this result even if the Grand Master were not empowered to suspend the Code for Trials.  A private organization is not in all instances bound by its internal rules.  The theory that the rules constitute a contract between the member and the organization has fallen into disrepute, *Higgins,* 51 *N.J.* at 200;  and while the member presumably has a reasonable expectation of receiving fair treatment, it is not necessarily the case that he expects that a particular set of rules must at all times be followed.  The threat of arbitrary action looms as the rules loosen, but such danger may be met as it arises.  In determining whether a private organization is bound by its established procedures, we would again balance the organization's interest in autonomy and its reason for straying from its rules against the magnitude of interference with the member's interest in the organization and the likelihood that the established procedures would safeguard that interest.

In this regard we note that a private organization has a great interest in controlling its own affairs.  A fraternal order may require considerable freedom from regulation because "its function of providing a place for congenial social intercourse cannot be fulfilled unless it has the power to control membership in those terms."  "Developments in the Law—Judicial Control of Actions of Private Associations", 76 *Harv.L.Rev.* 983, 991 (1963).  Professor Chafee noted that the health of society will usually be promoted if the groups within that serve the industrial, mental, spiritual and social needs of citizens are genuinely alive.  "Like individuals, they will usually do most for the community if they are free to determine their own lives for the present and future."  Chafee, *supra,* 43 *Harv.L.Rev.* at 1027 (1930).

---

[1]At trial, the court found Rutledge's law practice had not suffered as a result of his suspension.

In *Baugh v. Thomas, supra,* 56 *N.J.* 203, the threat to the plaintiff's interest was great (expulsion from his church), as was the likelihood that established procedures would have protected that interest (there would have been an insufficient number of votes to expel him), whereas the defendant church demonstrated no justification for ignoring its established procedures, and judicial intervention compelling adherence to a simple ministerial task did not threaten the church's autonomy. In the present case, however, the competing interests preponderate in favor of judicial deference, as noted above.

Turning to Rutledge's perturbation over the specially created Lodge of Judgment, we note that it is far from clear that the Grand Master could create such a panel, for Landmark 8, which may not be suspended, subjects "[e]very Mason, for Masonic purposes * * * to the jurisdiction of the lodge within whose jurisdiction he resides." On the other hand, Landmark 3 permits the Grand Master to convene a lodge at any time, to create lodges by his warrant, and to arrest the warrant of any lodge. At trial, Rutledge controverted the defendants' evidence that a Lodge of Judgment was permissible under Masonic law.

■ Given the difficulty that courts would encounter in attempting to interpret Masonic law, *cf. Higgins,* 51 *N.J.* at 202 ("courts ordinarily ought not to intrude upon areas of associational decision involving specialized knowledge"), judicial intrusion should be confined to procedures that are fundamentally unfair. We find no such unfairness in subjecting a former Grand Master to a special Lodge of Judgment. It is not claimed that such a Lodge is biased; in fact, the Masons created it to ensure impartiality. Additionally, the peace and harmony that the Masons intended to preserve in punishing Rutledge would be jeopardized should a local lodge assume jurisdiction over what are essentially affairs of the Grand Lodge. On the other hand, Rutledge has shown no compelling reason for having his local lodge sentence him. Accordingly, we refuse to invalidate the Lodge of Judgment.

Consistent with the principles enunciated above, we likewise refuse to order Rutledge's name reinstated on the mailing list or his portrait rehung in the gallery of past Grand Masters.

### III

So much of the judgment of the Appellate Division as is before us by way of defendants' appeal is reversed. The cause is remanded to the Chancery Division for entry of judgment for defendants. The injunction against the imposition of punishment through a Lodge of Judgment or by any procedure other than as ordained by the Code for Trials is hereby dissolved.

*For reversal*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK, O'HERN and GARIBALDI—6.

*For affirmance*—None.