**Irene B. BROUNSTEIN, Plaintiff,**

v.

**AMERICAN CAT FANCIERS ASSOC., et al., Defendants.**

Civ. A. No. 92–5116.

United States District Court, D. New Jersey.

Dec. 1, 1993.

Limitone & Hillenbrand, Morristown, NJ by Anthony Limitone, Jr., for plaintiff.

Shanley & Fisher, P.C., Morristown, NJ by Susan M. Sharko, for defendants.

## OPINION

HAROLD A. ACKERMAN, District Judge:

This case involves a dispute between an association of cat lovers and one of the association's former cat show judges. Before me now is the motion of the defendant association for summary judgment pursuant to Fed. R.Civ.P. 56. For the following reasons, defendant's motion is denied.

## I. Standard for Summary Judgment

■ Summary judgment may be granted only if the pleadings, supporting papers, affidavits, and admissions on file, when viewed with all inferences in favor of the nonmoving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *see Todaro v. Bowman,* 872 F.2d 43, 46 (3d Cir.1989); *Chipollini v. Spencer Gifts, Inc.,* 814 F.2d 893, 896 (3d Cir.), *cert. dism'd,* 483 U.S. 1052, 108 S.Ct. 26, 97 L.Ed.2d 815 (1987). Put differently, "summary judgment may be granted if the movant shows that there exists no genuine issues of material fact that would permit a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hospital,* 843 F.2d 139, 143 (3d Cir.), *cert. denied,* 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988). An issue is "genuine" if a reasonable jury could possibly hold in the nonmovant's favor with regard to that issue. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986). A fact is material if it influences the outcome under the governing law. *Id.,* 477 U.S. at 248, 106 S.Ct. at 2510.

■ Within the framework set out above, the moving party essentially bears two burdens. First, there is the burden of production, of making a prima facie showing that it is entitled to summary judgment. This may be done either by demonstrating that there is no genuine issue of fact and that as a matter of law, the moving party must prevail, or by demonstrating that the nonmoving party has not shown facts relating to an essential element of the issue for which it bears the burden. Once either showing is made, this burden shifts to the nonmoving party who must demonstrate facts supporting each element for which it bears the burden as well as establish the existence of genuine issues of material fact. Second, there is the burden of persuasion. This burden is a stringent one which always remains with the moving party. If there remains any doubt as to whether a trial is necessary, summary judgment should not be granted. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 330–33, 106 S.Ct. 2548, 2556–58, 91 L.Ed.2d 265 (1986); Advisory Committee's Notes on Fed.R.Civ.P. 56(e), 1963 Amendment; *see generally* C. Wright, A.

Miller, & M. Kane, Federal Practice and Procedure § 2727 (2d ed. 1983).

## II. Factual Background

The following facts are undisputed except where otherwise indicated.

The defendant American Cat Fanciers Association ("ACFA") is a non-profit Missouri association whose main goals are to promote the best interests of purebred and non-purebred cats as well as to further education, knowledge and interest in all domesticated cats. In furtherance of these goals, the ACFA serves as a central registry for purebred cats and sponsors related activities throughout the United States. One of these activities is the training and licensing of cat show judges who officiate at its sanctioned cat shows.

The ACFA has established various requirements for becoming a cat show judge. Only members of the ACFA may be licensed as cat judges. In 1987, the ACFA licensed plaintiff Irene B. Brounstein ("Brounstein") as a "specialty breed" judge. In 1990, Brounstein was promoted to "allbreed" judge. The distinction of being an allbreed judge apparently carries a higher honor among cat fanciers.

At a meeting of the ACFA Board of Directors in February, 1992, a majority of the Board voted to place Brounstein on a six-month probation with regard to her designation as an allbreed judge. Later that year, in August 1992, a majority of the Board of Directors voted to remove plaintiff's name from its list of judges. Brounstein continues to be a member in good standing of the ACFA.

Brounstein thereafter commenced this action against the ACFA and the ACFA Board of Directors, as well as the individual officers and directors of the ACFA, challenging the defendants' decision to place her on probation and subsequently revoke her judges' license.[1] In her amended complaint, Brounstein alleges that the defendants discriminated against her because she is Jewish in violation the New Jersey Law Against Discrimination;[2] and that the decision to place her on probation and remove her from the list of ACFA judges violated New Jersey's public policy and was contrary to the ACFA's Bylaws. Plaintiff also alleges a claim for tortious interference with prospective economic advantage.

The ACFA, in turn, contends that Ms. Brounstein's name was properly removed from the judges' list because she engaged in conduct inimical to the interests of the ACFA. Defendant ACFA has now moved for summary judgment as to each of plaintiff's claims.[3]

1. The action was commenced on November 3, 1992 in Superior Court of New Jersey, Morris County. On December 11, 1992, the action was removed to federal court based on diversity of citizenship jurisdiction.

2. Plaintiff also contends that she was removed in retaliation because she protested the 1991 election of ACFA's officers.

3. A federal court applying state law must apply the choice of law rules of the state in which it is located. *Klaxon Co. v. Stentor Electric*, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941); *see also Dent v. Cunningham*, 786 F.2d 173, 176 (3d Cir.1986). Thus New Jersey choice of law rules govern in the instant case.

In *Collins v. West Point–Pepperell, Inc.*, Civil Action No. 90–4619 (Sept. 10, 1992), I held that the LAD applied to domiciliaries of New Jersey. As noted in *Collins*, the LAD is explicitly aimed at preventing discrimination against inhabitants of the state. It reads, in relevant part:

The Legislature finds and declares that practices of discrimination against any of its inhabitants ... are a matter of concern to the government of the State, and that such discrimination threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State. ...

N.J.S.A. 10:5–3. The statute further provides that its policy is to protect and ensure "the economic prosperity and general welfare of the inhabitants of the State."

With respect to plaintiff's other claims, New Jersey courts apply a governmental interest analysis to choice of law problems. *Veazey v. Doremus*, 103 N.J. 244, 247, 510 A.2d 1187 (1986). Under this analysis, the law of the state with the greatest interest in governing the particular issue applies. *Id.* at 248, 510 A.2d 1187. In light of the fact that plaintiff is a New Jersey resident and the effects of the alleged wrongful conduct were felt here, I find that New Jersey substantive law governs plaintiff's claims for wrongful discipline and tortious interference with prospective economic advantage. *See Fineman v. Armstrong World Indus., Inc.*, 774 F.Supp. 225, 233 (D.N.J. 1991) (applying New Jersey law to New Jersey

III. Discussion

A. New Jersey Law Against Discrimination

The New Jersey Law Against Discrimination, N.J.S.A. 10:5–1, *et seq.* ("LAD"), prohibits unlawful discrimination in places of public accommodation. N.J.S.A. 10:5–12(f) prohibits any operator of a "place of public accommodation" from withholding or denying any person any of its "accommodations, advantages, facilities or privileges" on account of "race, creed, color, national origin, ancestry, marital status, sex, affectional or sexual orientation or nationality." Thus, to be subject to the proscriptions of the LAD, an organization or establishment must be a "place of public accommodation."

The ACFA argues that LAD has no application to this case as a matter of law for two reasons. First, it argues that "the designation of 'Allbreed cat judge' is not a place of public accommodation under the LAD." ACFA Brief at 5. Second, it argues that the ACFA is a purely private association and is therefore not subject to the LAD. Plaintiff, in turn, argues that by framing the issues in this way, the ACFA has distorted the nature of plaintiff's LAD claim. According to plaintiff, she is not claiming that the designation of "allbreed" judge is a "place of accommodation." Rather, she is claiming that *the ACFA* is a place of accommodation and that the "allbreed" judge designation is a *privilege.*

I find that plaintiff's formulation of the legal issues involved in this case is the only logical way to proceed. It may be, as the ACFA contends, that this case is not a dispute over membership in a private organization, as Ms. Brounstein continues to be a member of the ACFA. However, this contention begs the threshold question of whether the *organization* is subject to the proscriptions of the LAD at all. If an organization is subject to the LAD, it is prohibited from discriminating not just as to membership, but as to "*any* of the accommodations, advantages, facilities or privileges thereof." N.J.S.A. 10:5–12(f) (emphasis added). Thus, rather than asking whether titles or ranks in membership organizations are "places of public accommodations" within the meaning of LAD, I find it is conceptually sounder to ask whether titles or ranks constitute "privileges" within the meaning of the LAD.

I will therefore consider the parties' arguments within the following framework. First, I will consider whether the ACFA itself is a place of public accommodation or a private association. If I find that the ACFA is indeed a place of public accommodation, I will then consider whether the designation of cat show judge is a "privilege" within the meaning of the Act.

1. Is the ACFA a Place of Public Accommodation?

The statutory definition of "place of public accommodation" contains a lengthy, nonexclusive list of different types of facilities and establishments.[4] In addition, the definition provides that "[n]othing herein contained shall be construed to include or to apply to any institution, bona fide club, or place of

---

resident's claim of tortious interference with prospective economic advantage), *rev'd in part on other grounds,* 980 F.2d 171 (3d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993). Finally, the parties do not dispute that New Jersey law is applicable to plaintiff's claims.

4. N.J.S.A. 10:5–5(*l*) provides:

"A place of public accommodation" shall include, but not be limited to: any tavern, roadhouse, hotel, motel, trailer camp, summer camp, day camp, or resort camp, whether for entertainment of transient guests or accommodation of those seeking health, recreation or rest; any producer, manufacturer, wholesaler, distributor, retail shop, store, establishment, or concession dealing with goods or services of any kind; any restaurant, eating house, or place where food is sold for consumption on the premises; any place maintained for the sale of ice cream, ice and fruit preparations or their derivatives, soda water or confections, or where any beverages of any kind are retailed for consumption on the premises; any garage, any public conveyance operated on land or water, or in the air, any stations and terminals thereof; any bathhouse, boardwalk, or seashore accommodation; any auditorium, meeting place, or hall; any theatre, motion-picture house, music hall, roof garden, skating rink, swimming pool, amusement and recreation park, fair, bowling alley, gymnasium, shooting gallery, billiard and pool parlor, or other place of amusement; any comfort station; any dispensary, clinic or hospital; any public library; . . . .

accommodation, which is in its nature distinctly private." N.J.S.A. 10:5–5(*l* ).

The primary New Jersey case interpreting the term "place of public accommodation" in a case involving a membership organization is *National Organization for Women v. Little League Baseball*, 127 N.J.Super. 522, 318 A.2d 33, *aff'd mem.*, 67 N.J. 320, 338 A.2d 198 (1974).

*Little League* involved a challenge to the practice of Little League Baseball of excluding girls aged 8 through 12 from participation in its baseball programs. Little League contended that it was not a place of public accommodation because it was a membership organization that did not operate from any fixed parcel of real estate in New Jersey of which it had exclusive possession either by ownership or lease. The court rejected this argument, holding that "[t]he statutory noun 'place' (of public accommodation) is a term of convenience, not of limitation." *Id.*, 127 N.J.Super. at 531, 318 A.2d 33.[5] More significantly, the court found that "Little League is a *public* accommodation because the invitation is open to children in the community at large, with no restriction (other than sex) whatever." *Id.* (emphasis in original).

■ The Third Circuit subsequently applied the *Little League* analysis to a membership organization and further refined the standards for determining whether a membership organization constitutes a "place of public accommodation." *Kiwanis Int'l v. Ridgewood Kiwanis Club*, 806 F.2d 468 (3d Cir.1986), *reh'g denied*, 811 F.2d 247, *cert. dismissed*, 483 U.S. 1050, 108 S.Ct. 362, 97 L.Ed.2d 812 (1987). In *Kiwanis*, which involved a challenge to the exclusion of women from a local Kiwanis club, the court held that it is the "standard of open invitation to all that defines the content of a 'public accommodation,' and establishes the essential character of those organizations which are subject to the statute's proscriptions and those that are not." *Id.* at 473. The touchstone of the determination of whether a membership organization is a "place of public accommoda-

tion" is its selectivity in the admission of its members. *See id.* Thus, to be considered a public place of accommodations, "the organization or club must invite an unrestricted and unselected public to join as members." *Id.* at 475.

In *Kiwanis*, the Third Circuit held that the local Kiwanis club did not meet this test of unselectivity because, among other things, club membership was limited to 28 members and less than 20 individuals had been admitted to the club in the past decade. In addition, any new member had to be sponsored by a current member and formally voted in by the club's Board of Directors. According to the court, this sponsorship requirement functioned as a "primary screening mechanism in the maintenance of the quality of membership." *Id.* In addition to these national membership requirements, the club established several local membership requirements, including the candidate's willingness to pray at meetings and to recite the pledge of allegiance. Under such circumstances, the court held that the Kiwanis club did not pass the test of "unselectivity, unrestrictedness, and open invitation." *Id.* at 476.

■ The ACFA does meet this standard. It is undisputed that membership is "open to any person eighteen years of age or older, who is interested in cats ... upon making application for membership." Bylaws at Article IV, Section 1. There are no other restrictions on membership. In fact, the ACFA By-laws provide:

> **Acceptance of Applicants.** There shall be no requirement for the election of new members. Each applicant shall be deemed worthy of membership unless he or she shall have been expelled from membership under procedures hereinafter provided by these Bylaws.

Article IV, Section 3. *See also* Keuler Dep. at 46. Therefore, because the invitation to join the ACFA is open to the public at large, I find that it is a "place of public accommodation" within the meaning of the LAD.

---

5. The court noted that in any event, Little League satisfied the "place" requirement, finding that the "places of public accommodation" were the ball fields at which tryouts, practices, and games were held. *Id.*

▇ The ACFA relies on *Welsh v. Boy Scouts of America*, 993 F.2d 1267 (7th Cir.), *pet. for cert. filed*, 62 U.S.L.W. 3299 (Oct. 14, 1993), for the proposition that a private membership organization is not a "place of public accommodation." This argument is wholly without merit for several reasons. First, *Welsh* involved a challenge brought under Title II of the Civil Rights Act of 1964, not the LAD. Second, the Seventh Circuit's determination turned on its analysis of the statutory term "place" (of public accommodation). Specifically, the Seventh Circuit held that in enacting Title II, Congress "never intended to include membership organizations that do not maintain a close connection to a structural facility within the meaning of 'place of public accommodation.'" *Id.* at 1269. However, as discussed above, this reasoning as applied to the LAD has been explicitly rejected by the New Jersey courts. In fact, in *Kiwanis*, the Third Circuit held that in light of *Little League*, whether an organization satisfies the special "place" requirement is "irrelevant to the primary consideration stressed in *Little League* which requires that we scrutinize not *where* the gathering takes place but rather whether the invitation to gather is *open* to the public at large." *Id.* at 474.[6] Therefore, under New Jersey law, membership organizations are clearly covered entities under the LAD. Finally, *Welsh* explicitly acknowledged that the New Jersey courts have interpreted the analogous New Jersey statute differently. 993 F.2d at 1271–72 (refusing to adopt *Little League* interpretation of "place" (of accommodation)).

▇ The ACFA also argues that it falls within the "exception" to the statute providing that "[n]othing herein contained shall be construed to include or to apply to any institution, bona fide club, or place of accommodation, which is in its nature distinctly private." N.J.S.A. 10:5–5(*l*). However, this provision merely "represents the other side of the 'public accommodation' coin." *Kiwanis*, 806 F.2d at 476.[7] Thus, if an organization "is not a 'place of public accommodation' because of its selective membership practices, it must be private as that term is used in the statute." *Id.* In contrast, if an organization qualifies as a "place of public accommodation" under the standards enunciated in *Little League* and *Kiwanis*—as does the ACFA—then the "private" club exception of N.J.S.A. 10:5–5(*l*) does not apply. *See also United States v. Trustees of Fraternal Order of Eagles*, 472 F.Supp. 1174, 1175 (E.D.Wis.1979) ("the most important factor in determining whether a club is in fact private is the process which the club actually uses in selecting its members").

▇ Moreover, the fact that the ACFA considers itself to be a "private" organization is not dispositive of the issue. *See Clover Hill Swimming Club, Inc. v. Goldsboro*, 47 N.J. 25, 219 A.2d 161 (1966). In *Clover*, the New Jersey Supreme Court held that a swimming club, which in its sign and promotional literature consistently referred to itself as a "private" facility, was not "distinctly private" within the meaning of the LAD because it "sought to attract new members from the public at large" and because it "does not owe its existence to the associational preferences of its members but to the coincidence of their interest in the facilities offered by the owners." *Id.*, 47 N.J. at 33, 34, 219 A.2d 161.

▇ The ACFA argues that the standards governing designation of a member *as an allbreed judge* are extremely selective. However, this entire argument is irrelevant, because as discussed above, the relevant focus is on the nature of the organization's *membership* practices. The fact that an or-

6. The *Kiwanis* court acknowledged that other jurisdictions employ a different analysis. *See* 806 F.2d at 474 n. 11.

7. The ACFA cites *United States v. Lansdowne Swim Club*, 713 F.Supp. 785 (E.D.Pa.1989), *aff'd*, 894 F.2d 83 (3d Cir.1990), for the factors relevant to a determination of whether an organization falls within the private club exemption. However, *Lansdowne* was a Title II case. Thus, although a Title II case may perhaps be helpful by analogy, *see Grigoletti v. Ortho Pharmaceutical Corp.*, 118 N.J. 89, 97, 570 A.2d 903 (1990) (courts applying LAD may look to federal law "as a key source of interpretive authority"), where New Jersey (and Third Circuit) decisional law has already addressed the issue within the context of the LAD, this court will look to those cases for the appropriate standard for analysis.

ganization is selective with respect to the privileges and benefits it accords to members does not exempt that organization from the proscriptions of the LAD if it is otherwise a "public place of accommodation." In *United States Jaycees v. McClure*, 305 N.W.2d 764 (Minn.1981), cited with approval by the Third Circuit in *Kiwanis*, the Minnesota Supreme Court, in construing a public accommodation statute similar to LAD, held that the Jaycees were a "public place of accommodation" stating that the Jaycees were:

unselective in those to whom it sells its memberships; *selectiveness occurs only in the privileges and benefits it accords to those holding one kind of membership rather than another.*

*Id.* at 771 (emphasis added).

The ACFA also appears to argue that the LAD should have no application to this case because Ms. Brounstein was removed as a judge because the ACFA lost confidence in her judging abilities. However, this goes to the ultimate merits of the case, that is, did the ACFA remove the plaintiff from the judges' list because of her lack of abilities or because she is Jewish. No one disputes the ability of an organization such as the ACFA to grant certain privileges based on selective criteria. However, that question is not before the court at this time.

2. Is the designation of cat judge a "privilege" within the meaning of the Act?

 N.J.S.A. 10:5–12(f) prohibits discriminatory withholding or denial of "any ... accommodations, advantages, facilities or privileges." None of these terms are defined in the LAD. However, in resolving this issue, this court is guided by the principle that the LAD is to be liberally construed. *See Little League*, 127 N.J.Super. at 530, 318 A.2d 33 ("The law is remedial and should be read with an approach sympathetic to its objectives."). In this case, there can be no real dispute that a special designation of cat show judge is a "privilege" within the meaning of the LAD. It is undisputed that a

judging license is a benefit that the ACFA accords only to ACFA members.

The ACFA argues nevertheless that plaintiff was not denied any accommodation or advantage "of membership" in the ACFA. Specifically, the ACFA contends that plaintiff, like all ACFA members, is entitled to each of the following: (1) ACFA's Bulletin; (2) ACFA's Yearbook; (3) the right to vote in the election for ACFA officers and directors; and (4) the right to vote for amendments to the ACFA's Bylaws and Show Rules. The ACFA contends that plaintiff has not been denied any of these entitlements.

 Be that as it may, the ACFA does not dispute that only ACFA members can be designated as cat show judges. As such, it is clearly a privilege or advantage offered by the ACFA to certain of its members. Thus, although the ACFA could deny a member a judging license because he or she did not meet the qualifications for a license, it cannot deny the license based on that individual's race, creed or sex.

The fact that there are only a few allbreed judges does not dictate a different result. The ACFA is essentially arguing that in order for an entitlement to constitute an accommodation, advantage, or privilege within the meaning of the LAD, it must be equally available to all members of an association. However, the ACFA cites nothing in support of such a cramped reading of the phrase "any ... accommodations, advantages, facilities or privileges." As illustrated by *McClure*, 305 N.W.2d 764, the fact that an organization employs selectivity in bestowing privileges on its members does not shield that organization from the proscriptions of a public accommodation statute. Indeed, extending the ACFA's argument by analogy to the area of employment,[8] employers could not discriminate against entry-level employees, but could deny promotions to employees on the basis of race or religion. Such an interpretation of the LAD is simply not supported by the case law. *See, e.g., Erickson v. Marsh & McLennan Co.*, 117 N.J. 539, 555–56, 569 A.2d 793

---

**8.** Under N.J.S.A. 10:5–12a it is unlawful "[f]or an employer, because of the race, creed, color, national origin, ancestry, age, marital status ... of any individual ... to refuse to hire or employ or

to bar or to discharge ... from employment such individual or to discriminate against such individual in compensation or *in terms, conditions or privileges of employment*" (emphasis added).

(1990) (promotion); *Dixon v. Rutgers*, 110 N.J. 432, 541 A.2d 1046 (1988) (tenure and promotion).

The ACFA argues that "[a]pplying plaintiff's analogy to *Little League*, the LAD would apply to eight-year-olds suing to be appointed Pitching Coach or General Manager." ACFA Reply Brief at 5. Surely, the ACFA does not mean to suggest that Little League must allow all children to play baseball but may refuse to appoint a child team captain on the ground that he or she is black or Jewish or Catholic.

For these reasons, I find that the designation of "allbreed" judge is an "advantage or privilege" within the meaning of the LAD.

### 3. Evidence of Discriminatory Intent

In passing, the ACFA contends that plaintiff has failed to produce "one shred" of evidence to support her discrimination claim. However, although the ACFA has raised the issue, it has not briefed it. The burden of establishing the nonexistence of a 'genuine issue' of material fact is on the moving party. *See Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553 ("a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis of its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on files, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact"). Here, the ACFA has not explained why it believes there is no genuine issue of material fact, nor has it even cited any of the relevant case law with respect to

the evidentiary standards and burdens of proof applicable to discrimination cases.[9]

Nevertheless, based on the certifications presented by both parties, I find that there are material issues of fact which would preclude entry of summary judgment on the issue of discriminatory intent at this time. According to the certification submitted by the ACFA, the decisions to place plaintiff on probation and to later revoke her judging license were made pursuant to the Bylaws, after a review of her judge's file which, according to the certification, contained many letters of complaint about Ms. Brounstein's judging performance. *See* Certification of Wini Keuler, Executive Director of ACFA, at ¶ 2, 6. However, plaintiff has produced evidence that creates a genuine issue of material fact. For example, plaintiff cites to deposition testimony that at the August, 1992 meeting of the Board of Directors, the ACFA President, Thomas Herbst, stated "I realize she is a Jewish bitch. I know, my father worked for one." II Klarner Dep. at 85. There is also testimony that the ACFA President said he "did not particularly care for people of Jewish origin, not aimed at Ms. Brounstein." Keuler Dep. at 78.[10] There is also deposition testimony that when these comments were made, none of the Board members objected or took offense at the president's remarks. *Id.* at 79. Instead, one of the Board members, Robert Zenda, warned the president that he was being tape recorded. *Id.* Finally, plaintiff has submitted a sworn statement of an ACFA member that another Board member remarked a few weeks later "Maybe Hitler had the right idea

---

9. In this regard, I note that there is an issue, not addressed by either party, as to what standard and what burden-shifting analysis to apply. For example, in analyzing claims under the LAD, the New Jersey Supreme Court has sanctioned looking to federal law "as a key source of interpretive authority." *Grigoletti v. Ortho Pharmaceutical Corp.*, 118 N.J. 89, 97, 570 A.2d 903 (1990). In particular, at least in employment cases under the LAD, the Court has adopted the approach utilized by federal courts in cases under Title VII, particularly the burden-shifting analysis set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See id.; Shaner v. Horizon Bancorp.*, 116 N.J. 433, 437, 561 A.2d 1130 (1989). In *Grigoletti*, the Court emphasized, however, that the *McDonnell*

*Douglas* test is not to be applied "literally, invariably, or inflexibly." 118 N.J. at 98, 570 A.2d 903. Rather, the factors "provide only a general framework for analyzing unlawful discrimination claims and must be modified where appropriate." *Erickson*, 117 N.J. at 550, 569 A.2d 793. Thus, there is an issue as to what analysis is the most appropriate under the circumstances of this case.

10. The defendant contends that the ACFA President was speaking out *on behalf* of the plaintiff when he made these remarks. However, I find that even if true, the meaning and weight to be given these alleged statements is a task for the jury and not the court.

with the ovens." Certification of Kay Mowers. In addition, plaintiff submitted evidence that other judges' files contained complaints yet no disciplinary action was taken against those judges. II Klarner Dep. at 89–91. I therefore find that there is sufficient evidence from which a reasonable jury could find that the ACFA intentionally discriminated against the plaintiff because she is Jewish. Summary judgment must, therefore, be denied. As stated by the Third Circuit, because

> intent is a substantive element of this cause of action—generally to be inferred from the facts and conduct of the parties—the principle is particularly apt that courts should not draw factual inferences in favor of the moving party and should not resolve *any* genuine issues of credibility.

*Jackson v. University of Pittsburgh*, 826 F.2d 230, 233 (3d Cir.1987) (*quoting Ness v. Marshall*, 660 F.2d 517, 519 (3d Cir.1981)).

## B. Wrongful Discipline Claim

Plaintiff claims that the ACFA wrongfully removed her name from the judges' list because she is Jewish and because she protested the 1991 election of officers. She further claims that this decision was tainted by many procedural irregularities in violation of the ACFA Bylaws.

 The New Jersey Supreme Court has recognized a cause of action, under limited circumstances, for wrongful discipline by a private organization of one of its members. *See Rutledge v. Gulian*, 93 N.J. 113, 459 A.2d 680 (1983); *Higgins v. American Society of Clinical Pathologists*, 51 N.J. 191, 238 A.2d 665 (1968). The Court has set forth the following two-part test governing judicial intervention into the affairs of a private organization:

1) Does the plaintiff have an interest sufficient to warrant judicial action?; and

2) Has that interest been subjected to an unjustifiable interference by the defendant?

*Rutledge*, 93 N.J. at 118, 459 A.2d 680 (citing *Higgins*, 51 N.J. at 198, 238 A.2d 665.) I will consider each of these issues in turn.

1. Does the plaintiff have an interest sufficient to warrant judicial action?

 The New Jersey courts have held that an individual's valuable personal relationship to an organization and the status conferred by that relationship may be subject to judicial protection. *See, e.g., Rutledge*, 93 N.J. at 119, 459 A.2d 680 ("status, attributable to membership in a prestigious, socially-active fraternity [the Masons], merits protection from unreasonable discomfiture."); *Higgins*, 51 N.J. at 201, 238 A.2d 665 (status and professional recognition conferred by membership in professional organization warranted judicial examination); *Zelenka v. Benevolent & Protective Order of Elks*, 129 N.J.Super. 379, 383, 324 A.2d 35 (judicial review warranted in light of esteem conferred by membership in fraternity [the Elks] ), *certif. denied*, 66 N.J. 317, 331 A.2d 17 (1974); *see generally* Chafee, "The Internal Affairs of Associations Not for Profit," 43 *Harv.L.Rev.* 993, 1007–10 (1930).

 Here, I find that plaintiff's judging license represents an interest of sufficient value to warrant judicial review. According to plaintiff's certification, the ACFA's designation of a member as a judge enhances that member's reputation and prestige as a breeder, and can significantly increase the member's income from the sale of that member's cats. Brounstein Cert. at ¶ 16. In addition, the revocation of plaintiff's license prevented her from judging any more ACFA-sponsored cat shows. At the time the license was revoked, she was under contract to judge at least four cat shows during late 1992 and early 1993. *Id.* at ¶ 17. Finally, although Ms. Brounstein subsequently became a judge for another cat association, the American Association of Cat Enthusiasts, several individuals have apparently questioned her right to serve as a judge in light of the ACFA's action. *Id.* at ¶ 18. Thus, it is clear that the designation of judge accorded plaintiff with both status and reputation in the world of cat fanciers. The ACFA does not contend otherwise.[11] I therefore find that her interest in

---

11. In its reply brief, ACFA suggests for the first time that Ms. Brounstein does not have a protectible interest in being a judge because she testified during her deposition that she had no inten-

the designation of allbreed judge merits judicial review. I will now proceed to the next inquiry.

2. Has that interest been subjected to an unjustifiable interference by the defendant?

■ In determining whether an organization's interference with a member's interest is justified, judicial review of the organization's reasons for taking a particular action is limited. *Higgins,* 51 N.J. at 202, 238 A.2d 665. The New Jersey courts have recognized that an organization's interference with a member's interest is subject to judicial review in only two situations: a) where the organization's conduct was based on reasons that violate public policy; and b) where the procedures employed by the organization denied the member fundamental fairness. *See, e.g., Rutledge,* 93 N.J. at 119–125, 459 A.2d 680; *Higgins,* 51 N.J. at 202, 238 A.2d 665; *Zelenka,* 129 N.J.Super. at 383, 324 A.2d 35. Plaintiff contends that the ACFA's conduct falls within both these categories.

a. Violation of Public Policy

■ Plaintiff contends that the ACFA removed her name from the judges' list because she is Jewish, in violation of public policy. The ACFA argues, in turn, that its removal of plaintiff's name from the judges' list is supported by the written complaints about plaintiff's judging abilities and the Board's finding that plaintiff's conduct was inimical to the interests of the ACFA. However, as discussed above, whether plaintiff was removed from the judges' list because of her abilities or because she is Jewish is a question of fact precluding summary judgment. If it is true, as plaintiff contends, that she was removed because she is Jewish, the ACFA's conduct would certainly violate public policy. In the LAD, the New Jersey Legislature explicitly declares that discrimination against New Jersey residents based on religion

threatens not only the rights and proper privileges of the inhabitants of the State but menaces the institutions and foundation of a free democratic State.

N.J.S.A. 10:5–3. Therefore, summary judgment must be denied on this claim as well.

■ Plaintiff also contends that her license was revoked in retaliation for the exercise of her freedom of expression by protesting the 1991 election of ACFA officers. Specifically, according to plaintiff's certification, in January 1992, one of the board members notified plaintiff that she would recommend that plaintiff's license be renewed. On February 4, 1992, plaintiff protested the 1991 election because the votes had allegedly been improperly tabulated. On February 22, 1992, less than three weeks later, the Board of Directors placed plaintiff on probation, while judges with records similar to that of plaintiff were not placed on probation. Klarner Dep. at 89–91. On July 6, 1992, the ACFA Jurisprudence Committee ruled that the ballots in the 1991 election were improperly tabulated. The Board of Directors, however, rejected the decision of the Jurisprudence Committee. A month later, the Board revoked plaintiff's judging license.

I therefore find that a genuine issue of fact exists with respect to whether plaintiff's license was revoked because of her protestation or because of some other reason. If it was for the latter reason, this would be violative of public policy. *See Zelenka,* 129 N.J.Super. at 387, 324 A.2d 35 (expulsion of member who sent in letter to newspaper urging Elks to eliminate racial restrictions on membership invalidated as violative of public policy); *see also Loigman v. Trombadore,* 228 N.J.Super. 437, 450, 550 A.2d 154 (1988) (judicial intervention into the affairs of an association is justifiable when the complaining party has suffered an invasion of his or her civil rights) (citation omitted).

b. Denial of fundamental fairness

Plaintiff also claims that the ACFA's decision to remove her name from the judges' list

tion of re-applying to be an ACFA judge as she did not want to "be a part of an association that's anti-semitic." Ms. Brounstein's personal feelings after the revocation of her license, however, do not negate the fact that while she was a judge for the ACFA, her reputation and status among cat fanciers was enhanced.

violated its established procedures.[12]

■ The failure of an organization to follow its established procedures does not by itself constitute unreasonable interference. In *Rutledge,* the New Jersey Supreme Court held that "[a] private organization is not in all instances bound by its internal rules.... [W]hile the member presumably has a reasonable expectation of receiving fair treatment, it is not necessarily the case that he expects that a particular set of rules must at all times be followed." 93 N.J. at 123, 459 A.2d 680. In determining whether a private organization is bound by its established procedures, the court must "balance the organization's interest in autonomy and its reason for straying from its rules against the magnitude of interference with the member's interest in the organization and the likelihood that the established procedures would safeguard that interest." *Id.,* 93 N.J. at 123, 459 A.2d 680; *see also Clayton v. Trustees of Princeton University,* 608 F.Supp. 413 (D.N.J.1985) (applying balancing test).

■ The ACFA contends that the procedures it accorded plaintiff, that is, notification of the complaints against her and the opportunity to be heard, with counsel, accorded her fundamental fairness. However, the court in *Rutledge* mandated more than a consideration of the procedures that were followed by the organization. Rather, under the balancing test set forth in *Rutledge,* the court must consider: 1) the organization's interest in autonomy and its reason for straying from its rules; 2) the magnitude of interference with the member's interest in the organization; and 3) the likelihood that the established procedures would safeguard that interest. *Id.,* 93 N.J. at 123, 459 A.2d 680. The ACFA has not addressed any of these considerations in its brief. I therefore deny

its motion for summary judgement as to this part of plaintiff's claim as well.

C. Tortious Interference with Prospective Economic Advantage

■ "An action for tortious interference with a prospective business relation protects the right 'to pursue one's business, calling or occupation free from undue influence or molestation.'" *Printing Mart–Morristown v. Sharp Electronics, Corp.,* 116 N.J. 739, 750, 563 A.2d 31 (1989) (quoting *Louis Kamm, Inc. v. Flink,* 113 N.J.L. 582, 586, 175 A. 62 (E. & A.1934)). In order to establish a claim for tortious interference with prospective contractual relationship or economic advantage, a plaintiff must prove the following elements: 1) that a reasonable expectation of economic advantage or benefit belonged or accrued to the plaintiff; (2) that the defendant knew of such an expectancy; (3) that the defendant wrongfully and intentionally interfered with this expectancy; (4) that it is reasonably probable that without the alleged interference, plaintiff would have realized its economic advantage; and (5) that plaintiff was injured as a result of the defendant's conduct. *Fineman v. Armstrong World Indus., Inc.,* 980 F.2d 171, 186 (3d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1285, 122 L.Ed.2d 677 (1993); *see Printing Mart,* 116 N.J. at 751–52, 563 A.2d 31; *Leslie Blau Co. v. Alfieri,* 157 N.J.Super. 173, 185–86, 384 A.2d 859 *certif. denied sub nom., Leslie Blau Co. v. Reitman,* 77 N.J. 510, 391 A.2d 523 (1978); *see also* Restatement (Second) of Torts, § 766B.

■ The gravamen of a claim for tortious interference with prospective contractual relations is that the defendant's conduct was wrongful. *See Louis Schlesinger Co. v. Rice,* 4 N.J. 169, 180–81, 72 A.2d 197 (1950). In order for conduct to be deemed "wrong-

12. ACFA contends that it followed its established procedures in disciplining Ms. Brounstein. Indeed, it appears that ACFA did follow certain of its procedures. *See* Certification of Wini Keuler dated September 1, 1993. For example, it gave plaintiff notice of her probationary status and the complaint lodged against her, and gave her an opportunity to be heard at the August 1992 meeting with counsel, as provided under the ACFA Bylaws. *See id.* at ¶ 3. However, plaintiff has raised many other procedural irregularities, which the ACFA apparently does not dispute. For example, according to the plaintiff, ACFA did not investigate any of the complaint against her as required by its written procedures governing the ACFA Judging Program. In addition, according to the plaintiff, the Board violated its bylaws by considering certain complaints that were stale. ACFA does not deny these irregularities anywhere in its papers. Therefore, for purposes of this motion, I will assume that ACFA did violate certain of its established procedures.

ful," there must be proof of "malice." *Printing Mart,* 116 N.J. at 751, 563 A.2d 31; *Louis Kamm,* 113 N.J.L. at 588, 175 A. 62. Malice is defined as the "intentional doing of a wrongful act without justification or excuse." *Rice,* 4 N.J. at 181, 72 A.2d 197; *Printing Mart,* 116 N.J. at 751, 563 A.2d 31. Thus, an action for tortious interference will not lie if the defendant was exercising an equal or superior right. *See Louis Kamm,* 113 N.J.L. at 589, 175 A. 62; *see also Borbely v. Nationwide Mut. Ins. Co.,* 547 F.Supp. 959, 976 (D.N.J.1981) (where defendant had right to perform the act which gave rise to lawsuit, no cause of action for tortious interference with prospective economic advantage will lie.).

■ The ACFA argues that plaintiff's judging license was lawfully revoked pursuant to the Bylaws. It therefore argues that plaintiff's license was revoked in the exercise of an equal or superior right, entitling it to summary judgment on this claim. I disagree. This argument fails for the same reason it failed with respect to plaintiff's other claims, that is, whether plaintiff's license was lawfully revoked is a question of fact. Stated differently, there is a question of fact as to whether the ACFA's revocation of plaintiff's judging license was justified. Therefore, summary judgment as to this claim is denied as well.

### Conclusion

For the foregoing reasons, the ACFA's motion for summary judgment is denied.